Filed 4/18/14  In re A.S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.S., et al.<br><br>        Defendants and Appellants. | A137210<br><br>(Sonoma County<br>Super. Ct. No. 3901-DEP) |

T. S. (father) and R.S. (mother), the parents of ten-year-old A.S., appeal from an order declaring A.S. to be a dependent of the juvenile court.  Father contends that there is insufficient evidence to sustain the allegations of the Welfare and Institutions Code[1] section 300 petition.  Mother argues that the court erred in finding that A.S. came within the provisions of section 300, subdivision (b)(1) based on a finding of increased anxiety because anxiety does not constitute a "serious physical illness" within the meaning of the statute.  Parents join in each other's arguments on appeal.  We affirm the jurisdictional finding and reverse the dispositional order.

---

[1] All further statutory references are to the Welfare and Institutions Code.

1

# I. FACTUAL BACKGROUND

On April 23, 2012, a section 300 petition was filed alleging that father failed to protect A.S. because he has mental health issues with symptoms of paranoia and delusions, and exhibits aggressive, hostile, and menacing behaviors. The petition further alleged that father's mental health issues have contributed to A.S.'s elevated anxiety and stress, and that she has a presumptive diagnosis of Tourette's Syndrome. Finally, the petition alleged that the parents' relationship placed A.S. at risk because they had numerous domestic violence incidents.[2]

The petition was filed following an incident at A.S.'s school on April 17, 2012 (the April 17 incident). According to witnesses at the school, father, accompanied by A.S., entered the principal's office and demanded to see the principal. After yelling and pointing aggressively at the principal's assistant, who told father the principal was in a meeting, father "stormed" out of the office and into a private meeting being held by the principal in the school library. Father stated that someone had kicked A.S.'s backpack and angrily demanded that the principal deal with the school's failure to take action about A.S. being bullied. The principal explained he was in a confidential meeting, and could not speak to him at that time and that father should make an appointment. Father refused to leave until the principal spoke with him about his daughter being bullied. The principal asked him to leave several times and each time he refused; father left only after the principal called the police. During the incident, A.S. was, at first, "cowering," or crouched down behind her father, but ended up "in an upright fetal position," staring out the window at her teacher who was waiting outside. School personnel reported the incident to the Sonoma County Human Services Department (the Department) alleging that father was paranoid and that they feared for A.S.'s safety.[3]

---

[2] Father and mother are divorced and have lived apart since 2011.

[3] The School District also sought restraining orders against father. The court denied the requests, finding that there had been no credible threat of violence, no course of conduct that would place a reasonable person in fear for his or her safety, and no

On April 20, 2012, the Department filed a request for a protective custody warrant seeking temporary removal of A.S. from parents' custody. In addition to the allegations concerning the school incident, the Department asserted father had a criminal history including domestic violence incidents dating from February 2005 to December 2010; that the school psychologist had asked to be removed from A.S.'s educational evaluation because of father's aggressive and verbally abusive behavior; that father had aggressively demanded medical and mental health services for A.S. but failed to follow through with appointments resulting in termination of services; and that there were concerns because A.S. had not returned to school since April 17, 2012. The Department also alleged that, in a three-year period, A.S. had been asked not to return to two schools, due to father's conflictual nature.[4] The court granted the Department's request. On April 21, 2012, A.S. was detained and placed at the Valley of the Moon Children's Home (VOTM). Father was cooperative, and he was able to support A.S. emotionally and assisted her with packing a bag. He also appeared "somewhat paranoid," made rambling remarks about the wrongs committed by the school's staff, and about his own background, referring several times to his "intelligence and control" and stating he had worked for the government in the past and therefore had "good observational skills."

evidence that father had committed unlawful violence such as "assault, battery, or stalking," or that he was likely to commit acts of violence.

[4] This "fact" was repeated in another report, and was relied upon by the Department's expert, but we have found no evidence to support it. This assertion is found, first, in the Department's Prima Facie In Support of Petition, but there is no attribution, although from its context one might infer the information came from the principal at the school where the April 17 incident occurred. The principal's documents, however, do not contain this statement although they do describe numerous problems a previous school had with father's behavior. The record shows that A.S. left her preschool, where A.S. did "wonderful[ly]," because the family had to move; that A.S. was removed from one elementary school by father due to lack of IEP support; and that A.S. stayed at the second elementary school for two years before being moved by father to her current school. A.S. reported that the teacher in the previous school was mean. We found no evidence that *any* school asked A.S. not to return due to father's behavior.

Father stated that he "knew this was coming as the school was trying to get [his] child removed from [him]."

On the way to VOTM, A.S. told the social worker that she had been bullied by a girl who had kicked her lunch box. She said she told father, and he became angry. She said she was scared when father came to her school and she knew her teacher was scared. She also reported that father is "angry a lot, at a lot of people" and he also gets angry and yells at her for things like spilling food, and that sometimes this frightens her. A.S. denied any physical abuse by father.

The detention hearing was held on April 24, 2012. The court appointed counsel for parents. Parents submitted on the issue of detention, and requested that the matter be set for a jurisdiction and disposition hearing.

The Department filed an amended petition on May 17, 2012, to which father objected. At a May 18, 2012 hearing the Department stated that the parties had agreed to continue the hearing to June 6, 2012, and that in the meantime, the Department would file a second amended petition incorporating changes upon which the parties had agreed.

On May 25, 2012, an Individualized Education Program (IEP) meeting was held to discuss A.S.'s eligibility for special education services. It was determined that she was ineligible for services.

On June 4, 2012, the Department filed a second amended petition. In support of the petition's assertion that A.S. has suffered or is at substantial risk of suffering serious physical harm or illness, the Department alleged that father had been diagnosed with anxiety and had exhibited "aggressive, hostile, and menacing behaviors" contributing to A.S.'s elevated anxiety and stress. Specifically, the petition described the April 17 incident, and alleged that "[A.S.] is scared of her father." The petition also alleged that mother failed to protect the child by allowing her to reside alone with father, and thus be exposed to father's emotional instability and erratic behavior. As a separate matter, it was alleged that "since or about July 2011" father had not consistently taken A.S. to scheduled appointments with Sonoma County Mental Health (SCMH), and that A.S.'s services were therefore terminated.

4

As against father and mother, the petition alleged that their history of domestic violence "renders them unable to provide adequate care, supervision and a safe living environment for [A.S.]." Specifically, the petition recited five incidents of alleged domestic violence between 2006 and 2010.[5] Pursuant to section 300, subdivision (c), the Department separately alleged—on the bases of the April 17 incident, A.S.'s alleged fear of father, and the parents' history of domestic violence—that A.S. is "suffering, or is at substantial risk of suffering, serious emotional damage evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward [her]self or others."

On June 6, 2012, the court granted father's request to continue the matter for two weeks. On June 20, 2012, the court appointed new counsel for father and continued the matter for another three weeks. On July 11, 2012, the matter was continued again to give father's counsel time to prepare for a contested hearing. In response to mother's inquiries at the hearing regarding how she could communicate with A.S., the parties learned for the first time that A.S. had been moved from VOTM to a foster home on July 3, 2013. On July 23, 2012, upon the Department's request and the stipulated agreement of the parties, the court continued the matter to August 28, 2012.

The Department thereafter filed an addendum report. It stated that father was resisting meeting with the social worker on the case, and had referred the social worker to his attorney. The report also stated that father had severe anger management issues that have been "getting worse and worse over the years," but provided no evidentiary support for that assertion. The report referred to father's criminal history and indicated that the social worker and others are nervous and anxious when dealing with father. According to the social worker, the police reports describing the domestic violence incidents show that A.S. has been exposed to father's emotional instability and erratic behaviors which has caused A.S. to be "anxious and stressed while in the care of the father." The report also stated that the parents had cooperated with the Department, that they had consistently

---

[5] The Department's allegations concerning the dates of the domestic violence were incorrect. The record reflects that the last alleged domestic violence incident occurred on March 17, 2009.

5

visited with A.S., that mother had started therapy sessions and that father had completed California Parenting Institute (CPI) parenting classes and met with a resource worker and parent educator. The Department, however, noted that father was in denial about causing A.S. anxiety and that he refused to attend an anger management program in a group setting. The Department's addendum report included the statement of Karen Church, the parent educator, who was deployed to father's visits with A.S. in August 2012.

Church stated that on her first visit, father asked her not to sit so close, and after she moved farther away father said she was staring at them; he said he did not like her staring at him and that she was making him very nervous. As this was occurring, A.S. appeared very uncomfortable and was bent way over the table while eating. During her second visit, father asked Church not to talk because A.S. was eating and "she likes it quiet while we are eating." A.S. appeared to be very anxious and was bent even further over the table than the previous visit, with her face at the level of the food containers. Church and father spoke a little, then she observed father interacting with A.S. During that time, A.S. apologized to father multiple times for random things, such as when she tried to pull off a sticker from a different side of the sticker than father had recommended. At one point father told her that she did not need to say she was sorry for everything. Church opined that A.S.'s behavior showed she was worried that father would erupt in anger at a service provider in front of her, and therefore Church's visits were only compounding A.S.'s distress. Church concluded that it seems likely father "may have other issues that need to be addressed before he will be able to accept parent education services."

The addendum included a letter from a parent of one of A.S.'s classmates who had been taking photographs of A.S. for the school yearbook in late February 2012. The parent stated that father became upset that she had taken photographs of A.S., and that he wanted them deleted. He said his daughter had a disability and questioned why she would want pictures of her. The parent explained they were for the school yearbook. Father insisted, however, that the photographs be deleted immediately. The parent opined

that father was "notabl[y] irate and irrational." The parent wanted to be assured that she could continue to take photographs of her own child and not feel threatened by father.

The addendum further attached a letter from the school principal to father dated February 24, 2012, in which he acknowledged three incidents involving A.S.—a student's comment that A.S. looked "weird" when her face had spasms, another student throwing a backpack (though the principal said the backpack was not thrown at her) and some girls chasing and poking a rosemary branch at her and a friend during recess. The principal stated these incidents did not appear to be a pattern of bullying but rather were isolated incidents with no ill will intended.

Finally, the addendum included an e-mail from the principal to school administrators, sent in March 2012. The principal described numerous problems that A.S.'s previous school had reportedly had with father; he also stated that his own office staff, as well as A.S.'s teacher, had concerns about father's "escalating erratic, angry, aggressive behavior."

The contested jurisdiction/disposition hearing began on August 28, 2012. Billy Harville, the Department's emergency response worker, testified that he investigated a referral from the school following the April 17 incident to determine whether A.S. was at risk of abuse and neglect. He learned that father was no longer eligible to work at Goodwill Industries due to his personality issues. Phyllis King, a therapist at SCMH, told Harville that father had requested services for A.S. due to her symptoms of Tourette's Syndrome. Father reported that A.S. was being teased and bullied at school but A.S. reportedly told King, " 'not really.' " King also told Harville that father had left some messages, the content of which caused her to believe that father was paranoid and delusional. Harville found King's opinion "important" because what he was "looking for was a pattern of behavior that might . . . be consistent with what was seen in his behavior at school." Harville was also concerned about father's criminal record and involvement in domestic violence incidents.

Edward Merrin, a psychiatrist, testified that he had been treating father since February 2012. His "working diagnosis" was that father has some personality problems

and difficulties working with people.[6] Also, father has a past history of anxiety and is currently taking Lorazepam, an anti-anxiety medication, on an as-needed basis. With respect to father's relationships with adults, Dr. Merrin opined that father is very sensitive to criticism and concerned that people are finding fault with him; if he suspects that is happening he will perceive people as being against him or withholding help.

Dr. Merrin did not find that father was delusional, though he could be described as having a "paranoid cognitive style" of projecting blame on others and in his views of other people's motives. Dr. Merrin had not seen any cognitive impairments or "behavioral aspects" in father that could potentially place A.S. in danger. Father is not manic depressive or schizophrenic. Dr. Merrin had not observed any violent tendencies, or threats of violence. Dr. Merrin does not have any concerns about father hurting others, nor was he alerted to any concerns by his review of father's previous mental health records. He agreed, however, if the Department's allegations were true, that father would benefit from anger management treatment.

Dr. Merrin's progress notes indicate that father suffers from anxiety, particularly about "what may happen to him and his daughter, a feeling of 'impending doom.'" A second clinical issue is his perception that people are "denying him things he is entitled to, cheating him, or otherwise mistreating him or his daughter." During a previous evaluation father was "seen as having paranoid ideas, either delusional or as part of a paranoid personality." Dr. Merrin describes father as polite and socially appropriate but spends time "protesting that he has not been inappropriate and his actions have been justified." The doctor stated that father has "[p]oor insight into how he is perceived by others or how his actions might influence their response to him," but he saw no delusions or other psychotic symptoms.

---

[6] Merrin's actual diagnosis was personality disorder with some mix of paranoid and narcissistic features.

Nadene Van Vranken-Kemper, a clinical social worker with the SCMH, testified that she evaluated A.S. to determine if she met the criteria for County services.[7] She opined that it appeared that A.S. had "Tourette's disorder." She recommended that A.S. see a psychiatrist for further evaluation of the disorder. Vranken-Kemper was also concerned about A.S.'s anxiety. A.S. was anxious at bedtime and needed to have her father present, as well as her sippy cup and a stuffed animal, during the transition time in order to feel comfortable to go to sleep. She was also anxious at school about using the restroom there. Vranken-Kemper did not recall A.S. talking about any bullying—although father did—but A.S. did have issues with friends at school who sometimes rejected her or did not want to play with her. Vranken-Kemper opined that A.S. might have difficulty reading social cues. A.S. was self-conscious about her tics and her treatment goal was to help her address them.

Vranken-Kemper noted in her assessment that one of the family's strengths was that father sought help from professionals to help with A.S.'s needs and in raising and supporting her. At the time of the assessment in January 2012, Vranken-Kemper had no concerns about any immediate harm to A.S.'s safety or emotional or physical well-being in father's care. After counsel recounted the past incidents of domestic violence, Vranken-Kemper was asked whether those would change her assessment in any way. She responded that a future clinician might want to look "more strongly" at ruling out post-traumatic stress. She also expressed some concern about the level of anxiety A.S. might have if she is being exposed to father's angry, aggressive behavior.

Vranken-Kemper's report indicated that A.S. had Tourette's Disorder, based upon her tics. She was also found to meet criteria for "Anxiety Disorder [Not Otherwise Specified] due to her propensity to be anxious/compulsive" with evidence of "some accompanying mild depression"—she feels "rejected by peers, reports [she] commonly feels sad, sensitive or lonely . . . ." Vranken-Kemper found that A.S.'s anxiety was "causing problems, consistent with a diagnosable disorder" and that A.S. was suffering

---

[7] The evaluation was completed in January and February 2012 at father's request.

some trauma due to her having witnessed domestic violence. The report described A.S. as having "moderate needs" in the areas of social resources and mental health, but no "severe needs" were identified, nor did the evaluator find any trauma due to "emotional abuse."

In April, just prior to A.S.'s removal from father, another psychological assessment was prepared to determine A.S.'s eligibility for an IEP.[8] The evaluator conducted three assessments of A.S., the last occurring on April 20, three days after the school incident. The report explained that any score in the "clinically significant" range suggests a high level of maladjustment, and scores in the "at risk" range can identify a "significant problem that may not be severe enough to require formal treatment, but has the potential to develop into a problem and needs careful monitoring." The report concluded that A.S. was "at risk" in the areas of social stress, sense of inadequacy, relation with parents (mildly to moderately disturbed relation with parents) and self-reliance, but made no "clinically significant" findings. The assessment also showed very elevated scores in the "depressed themes." The evaluator concluded, however, that A.S. did not qualify for special education services "under the handicapping condition of Emotional Disturbance." The evaluator found, inter alia, that A.S. did not have "[a] general pervasive mood of unhappiness or depression," or any "tendency to develop physical symptoms or fears associated with personal or school problems." Further, according to her teacher at that time, A.S. had "good work habits, always gives a good effort and always completes homework." The teacher also stated that A.S. had a positive attitude, was very attentive, worked hard, and played well with the other children. Additionally, A.S. was reported to have "a dramatic drop in the number of tics exhibited in the past 2 to 3 weeks [during early April]."

Juana Garcia, the social worker handling this matter, testified she believed A.S. would be at risk of "substantial danger" if returned to father's care because he has not

---

[8] Ms. Freeman, a licensed psychologist, completed the evaluation, but she did not testify at the hearing.

10

"dealt with his anger issues," that is, he was provided a referral for an anger management program but he had not made an appointment. Garcia believes father has anger issues based on the April 17 incident and his confrontations with other staff at the school. Garcia testified, referring to the "contact notes" in the file, that A.S. had told the social worker who drove her to VOTM that she was afraid of father. She later clarified, however, that A.S. told the social worker she was scared when father got angry, and not that A.S. had a generalized fear of father. To Garcia, A.S. said she was "just a little bit afraid of dad," when he is angry and yells. Garcia's knowledge as to whether A.S. is suffering anxiety is that her eyes open and close a lot; "that's basically the only way I can tell if she's nervous." Garcia's concern, if A.S. were returned to father's care, is that her Tourette's "heightens when she's around somebody that's really anxious and angry" and Garcia is concerned about A.S.'s emotional well-being, as she "shuts down really easily."

When Garcia was making the decision regarding where to place A.S. after the foster home placement, she spoke with A.S. twice; A.S. said that she wanted to go home with father. With regard to father, Garcia testified that he has been consistent and generally appropriate in his visits with A.S. She had referred father for in-home parenting, a resource worker, a psychological evaluation, and therapy in addition to a 52-week anger management program. Father had participated in parenting classes and completed them. He had also met with the resource worker to whom he had been referred. Garcia did not give father a referral for a therapist until August. She did not know father was seeing a psychiatrist, and she did not ask him. Garcia also acknowledged that, except for father's failure to follow through with referrals, father had been cooperative with the Department and attentive to his daughter's needs.

Garcia reported that A.S. was no longer in her foster care home placement as of September 28, 2012, and was back at the VOTM. A.S. had behavioral issues at the foster placement including stealing, yelling, slamming doors, failing to do her homework, and not following basic house rules. It was Garcia's opinion that A.S. was "modeling behaviors she has learned in her home." When asked her opinion why A.S. was acting out, Garcia stated, "the only thing I can think about is she wanted to go home."

11

Garcia also testified that she had some personal fear of father based on her interactions with him. On cross-examination, she acknowledged that these concerns emanated from two telephone conversations in which father's tone was harsh, demanding, and upset. Garcia asked father to modulate his tone, or she would hang up. In the five months since those calls, father had not exhibited any confrontational conduct, although Garcia opined this was because there was a guard present in the visitation area, which is where Garcia would see father.

Garcia admitted that she did not pursue any treatment for A.S.'s Tourette's syndrome.[9] She further admitted that the Department did not arrange for A.S. to begin therapy until late August, and she did not know the reason for the delay. Garcia did not call A.S.'s therapist in preparation for her October addendum report and so had no idea what the therapist's opinion was as to whether or not A.S. is suffering severe emotional distress. A psychological evaluation of A.S. was not scheduled until after August 28, 2012, the first day of the jurisdictional hearing.

On September 10, 2012, Dr. Gloria Speicher, a psychologist, evaluated A.S. She testified that she found A.S. to be anxious and confused about the subject of anger. Dr. Speicher said it was not an "overwhelming issue" for A.S. but it is a "present issue for certain." She identified that A.S. has an obsessive-compulsive disorder which can impact her understanding of her emotions and how to deal with them. She described A.S. as anxious and depressed, exhibiting a flat affect and a general lack of desire for joy. Dr. Speicher found this to be consistent with Dr. Freeman's evaluation which described A.S. as being kind of sad and depressed, and expressed concerns about A.S.'s self-confidence and personal adjustments. She also noted that anxiety and depression are commonly found with a diagnosis of Tourette's Syndrome.

In her report, Dr. Speicher diagnosed A.S. with "Chronic Motor or Vocal Tic Disorder," and "Obsessive Compulsive Disorder [OCD]" and identified the following

---

[9] Garcia did not recall receiving paperwork from father regarding a referral to the University of California, San Francisco Medical Center's Tourette's and Tic Disorders Clinic (the UCSF Tourette's Clinic), and did not follow up on it.

"Psychosocial" factors:  "Disruption of family by separation or divorce; Removal from home; Allegations of parental overprotection and/or neglect; [and] Possible discrimination (bullying)."  Dr. Speicher described A.S. as "quite anxious" and in need of "expanding her coping mechanism."  Dr. Speicher noted that A.S. had been diagnosed with Tourette's Syndrome, but she did not believe A.S.'s symptoms met all the criteria for that condition.  Nonetheless, she concluded that A.S. appears "to have a disorder that may be closely related" and that "[t]here is a strong anxiety component involved and it is not possible easily [to] separate whether this is cause or effect."  Dr. Speicher noted that there are many potential complications with Tourette's Syndrome—including anxiety and depression—and it is therefore "very important that individuals with Tourette's receive consistent medical care that includes a comprehensive treatment plan."  At the hearing, Dr. Speicher testified that A.S.'s tic disorder could be an anxiety disorder rather than a neurological condition.  Dr. Speicher found it "very disturbing" that father had failed to follow through with A.S.'s medical care.

The report noted father "also reportedly failed to keep scheduled medical appointments for [A.S.] with [SCMH] and as a result of his actions, her care was terminated, thus putting [A.S] at risk."  In this regard, she testified that an individual with Tourette's "requires somebody really maintaining a clear oversight and commitment to the treatment that is required . . . [i]t takes a lot of energy and a lot of effort to attend to that."  She found it "distressing" and "confusing"—given her impression that father is "very, very adamant about providing his daughter with good care"—that he did not follow through with A.S.'s medical care.  What A.S. needs from her father,  Dr. Speicher opined, is "a concerted team effort in terms of her treatment approach and consistent compliance with treatment so that she's got therapy and she's got . . . probable medication . . . in regard to either the tic disorder or anxiety disorder . . . . [She] needs to have somebody who's going to understand the wide range of her potential diagnosis, . . . and be able to go beyond just focusing on whether or not she's bullied in school and getting the appropriate things.  There needs to be attention paid to the whole picture."  Dr. Speicher also opined that where there is a history of domestic violence as well as

13

current reports of out-of control behavior, both impacting the child, the "parent needs to have an understanding of that impact on the child in order to demonstrate their cooperation [in A.S.'s and their own treatment]."

In her report, Dr. Speicher expressed serious concerns about the past history of domestic violence to which A.S. had been exposed, opining that A.S.'s Tourette's Syndrome has been "very likely impacted" by the exposure to violence between her parents since she was two years old. She stated that the experience of fear and vulnerability that occurs when exposed to domestic violence is "printed indelibly in the minds of children," and because of the ongoing "dynamics" of the adults, the child is usually not provided with "the necessary and sustained respite and therapy that can help them understand and learn more reasoned responses to life's upsets and challenges." At the hearing she testified that A.S.'s historical exposure to domestic violence will have "tremendous repercussions" so it would be of concern if A.S. were placed in a situation where "her responses . . . to growing up in domestic violence are not being attended to [or] not being recognized."

Dr. Speicher opined that A.S. was at risk of serious emotional harm based upon all of the information provided in the jurisdictional report, including the history of domestic violence, the fact that three professionals (the principal, the parent educator and someone at Goodwill Industries) have stated they are fearful of father, the fact that three schools have said A.S. could not return because of father's behavior, and the fact that father does not understand the impact of that behavior on his daughter, which she found "very, very concerning." In her report, Dr. Speicher stated that, while father was to be commended for his concern for and support of his daughter, it was nonetheless "disconcerting" that father cannot appreciate how his behavior impacts others, and how it impacts A.S. in particular.

Dr. Speicher could not say to what degree A.S.'s dependent and regressive behaviors are caused by father's behavior, if at all, because "you can't parcel that out just because of the difficulty of the diagnosis. [Y]ou have to say it's a potential for that.

14

Unfortunately it's going to be one of those things that's going to show up in the treatment and hopefully it will simply resolve with enough concerted effort on everybody's part."

Dr. Speicher did not know why A.S. had recently stopped doing her homework when it had never been a problem before, but A.S. did express a "theme" that she was being pushed too much and did not have time to play, so it might be different parenting styles between father and the foster parents.

 Dr. Speicher also opined that children who have been exposed to domestic violence cannot receive the care they need from a parent who has not "dealt with [his or her] issues about domestic violence and [does not] understand[] fully the potential negative impact on their child."

Father testified and denied having any anger issues.  He also denied being aggressive, hostile or menacing at the meeting in the school library on April 17, 2012. He admitted to Garcia, however, that he had "overreacted."  Father acknowledged a conviction for brandishing a firearm replica.  He denied recollection of domestic violence incidents that allegedly occurred in 2007 and 2009, stating that he had a memory problem due to the medication he took.[10]

Father testified that after A.S. was evaluated by a psychologist, he followed up on the psychologist's recommendation to obtain an IEP for A.S.  A.S. was subsequently evaluated by Dr. Freeman, and the IEP meeting occurred at VOTM after A.S. had been removed from father's care.  Dr. Freeman determined that A.S. was not eligible for special education services, and father signed off on that determination.

Father also took A.S. to see Phyllis King, for a psychological evaluation.  King recommended that A.S. see a psychiatrist, but the one to whom she referred father had already seen A.S. the previous year and determined that she did not require psychiatric services.  King told father that she would set up some appointments for A.S. but father

_____

[10] Dr. Merrin testified that it was unlikely that father's medication would cause long-term memory loss.

never heard from her.  Later, he received a letter that he had missed appointments.  According to father, he called SCMH after receiving the letter.

In the meantime, father had joined the Tourette's Syndrome Association, which referred him to the UCSF Tourette's Clinic.  Father completed the paperwork in February 2012, and set up an appointment with the clinic.  The appointment was set for a date in June.  He told Garcia about the appointment and delivered the paperwork regarding the appointment to her office.  Garcia told him that the Department would follow-up and would cover any costs.  Prior to A.S. being detained, father had also taken A.S. to see Dr. Hamman (A.S.'s pediatrician) who changed A.S.'s diagnosis from presumptive Tourette's Syndrome to a known diagnosis of Tourette's Syndrome, anxiety disorder, and ADHD (attention deficit hyperactivity disorder).

Father testified that A.S. reported she was being teased at school from the beginning of the school year of 2011 to 2012.  Father sent a letter to the school complaining about the incidents and other matters.

When asked about "all the reports that [his] anger is harming [his] daughter," father stated, "I'm thinking that there's a lot of people that have issues about me and my so-called anger."  Father acknowledged that he had been upset in front of A.S. and in front of other people, but he denied that he had been angry.  He said, however, that he had heard the experts testify as to the potential effects on A.S. of witnessing his anger and that, based on those reports, he intended to "try to get back to treatment with my child and continu[e] my treatment."  That is, he intended to continue sessions with his psychiatrist, with whom he had been in treatment since November, to continue in counseling with a licensed therapist, which he had begun the previous week, and to continue involvement in spiritual counseling, which he began two or three months earlier.  Father testified that he had discussed with Dr. Merrin the importance of pursuing treatment for domestic violence issues, either individually or in a group, and stated that

16

he intended to follow through with that treatment.[11]  He also testified that he had undergone domestic-violence related counseling for three or four months approximately three years ago.  He had also already taken three parenting classes through CPI including "Positive Parenting" and "Handling my Anger:  Me and My Child."

Father "at this point" would not acknowledge that his conduct has harmful impacts on A.S; even after hearing Dr. Speicher's testimony, father continued to believe that his conduct has had "no effect whatsoever" on A.S.  But the fact that A.S. told the social worker she was afraid when he got angry would, father testified, have an impact on how he would act around her.  Father reiterated what he would do to "change his behavior," i.e., continue psychiatric treatments, follow Dr. Merrin's recommendations, continue therapy and continue spiritual counseling.  Father also intended, if A.S. were returned to him, to pursue treatment for A.S. at the UCSF Tourette's Clinic, which provides a "team approach."  Father admitted he was not currently discussing anger management with his psychiatrist, and had only had an "intake" with his therapist, and so had not yet had any substantive sessions.  Father does not believe he has an anger problem, but agreed with the diagnoses of his psychiatrist, Dr. Merrin, regarding cognitive distortions, personality disorder, and probable dysfunction on an interpersonal level.  Father also testified he did not believe A.S. was cowering behind him during the school incident, and he did not believe he caused A.S. to be afraid.

The court found that the Department failed to meet its burden of proof with respect to the section 300, subdivisions (b)(4) and (c)(2) allegations based on parents' history of domestic violence.[12]  The court, however, sustained the remaining allegations of the petition with the exception of two modifications.  It amended the section 300, subdivision (b)(1) allegation finding that father's "on-going emotional instability and erratic behaviors contributed to the elevated anxiety and stress of [A.S.]" placing her at

---

[11]  Father stated that, prior to hearing the testimony from the experts, he had not known nor ever read about the impact that domestic violence could have on children.

[12]  So far as we can discern, none of the alleged domestic violence incidents resulted in a prosecution.

17

substantial risk of increased anxiety.  The court's amendment changed the petition's language to strike the term, "emotional harm," replacing it with the term, "increased anxiety."  The court also sustained the allegation that father had failed to provide medical treatment.  Finally, the court sustained and amended the section 300, subdivision (b)(2) allegation respecting mother's failure to protect A.S. from father's conduct, finding that it placed A.S. at substantial risk of "increased anxiety," again striking the term "emotional harm."  The court also found by "[c]lear and convincing evidence" that placing A.S. in the home of parents is contrary to her welfare.  Regarding disposition, the court found that A.S. should be removed from parental custody.  Parents appealed.

## II.  DISCUSSION

Father contends that the evidence is insufficient to sustain the allegations of the petition.  He argues that the Department failed to present any evidence that he placed A.S. at a substantial risk of suffering substantial "physical harm or illness" as alleged in count (b)(1) of the petition.  He also asserts that there was insufficient evidence to support the trial court's finding that A.S. was at substantial risk of suffering serious emotional damage in her father's care under subdivision (c)(1) of section 300.  Mother argues that the court erred in sustaining jurisdiction on the basis of "increased anxiety" because anxiety is not a serious physical illness within the meaning of section 300, subdivision (b).

" 'In juvenile cases, as in other areas of law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.  All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged to uphold the verdict, if possible.' [Citation.]  ' "If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed . . . ." ' " (*In re Rocco M.*  (1991) 1 Cal.App.4th 814, 820.)

"However, substantial evidence is not synonymous with *any* evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. . . . 'The ultimate test is whether it is reasonable for a trier of fact to make the

18

ruling in question in light of the whole record.' [Citation.]" (*In re Savannah M.* 131 Cal.App.4th 1387, 1393–1394.)

### A. *Allegation b-3: Failure to Provide Medical Treatment*

The trial court found the Department had proven its jurisdictional allegation that there was a substantial risk A.S. would suffer serious physical harm or illness because father failed to provide medical treatment for A.S. This was manifest error.

The evidence in the record is virtually undisputed that father has consistently provided—and aggressively pursued—medical and psychological treatment and services for A.S.[13] The failure to provide medical care allegation, so far as we can determine, was originally predicated on the missed appointments in March 2012. In later reports, the Department stated that father had stopped taking A.S. to mental health services in July 2011, and that those services were therefore terminated. All of the petitions alleged that father had failed to provide adequate medical care for A.S. "[s]ince or about July 2011." We find nothing in the record to support this assertion. There is a passing reference in Vranken-Kemper's report that the "[f]amily did not attend a scheduled evaluation with a psychiatrist" relating to A.S.'s diagnosis of ADHD in early 2011; the only other evidence relating to medical services in 2011 is a report that a mental health counselor "worked with the father . . . from January 26, 2011 to July 26, 2011," and that "his case was closed shortly thereafter."

More importantly, there is not a scintilla of evidence that the missed appointments, or the termination of services by SCMH, ever put A.S. at risk of any harm, much less "serious physical harm or illness." (§ 300, subd. (b).) The 2012 appointments were for an evaluation of A.S. with respect to possible medications for her Tourette's Syndrome

---

[13] The record reflects regular dental visits in 2010 and 2011, extensive pediatric care records for early 2012, including a letter from A.S.'s pediatrician stating that he had assumed care for A.S. for the previous six months (from April 26) and that father had been compliant with his recommendations, and a record of A.S.'s immunizations ranging from 2003 to 2011. Ms. King's notes indicate that father was "very persistent" about getting mental health services for A.S. Father also provided testimony regarding all of the medical, psychological and educational services he sought to secure for A.S.

19

symptoms, and not appointments for ongoing care. Similarly, the 2011 appointment was apparently for an evaluation relating to a diagnosis of ADHD. Further, the evidence shows that after receiving the 2012 SCMH evaluation, father joined the Tourette's Syndrome Association and was referred to the UCSF Tourette's Clinic. He submitted paperwork for the clinic in February 2012, and an appointment for A.S. was scheduled for June. Father's plan was to follow through with UCSF—having secured the approval of A.S.'s pediatrician—which provides a "team approach." After A.S. was removed, father told Garcia about the UCSF appointment and dropped off the paperwork at the Department's office.

There being no evidence to support the conclusion A.S. was ever at risk of harm "by the willful or negligent failure of the parent . . . to provide the child with . . . medical treatment," the trial court erred in so finding.

### B. Allegation b-1: Failure to Protect—Substantial Risk of Serious Physical Harm or Illness

Based upon the evidence we have summarized, the trial court found that the Department had not sustained its burden of proving that A.S. was at risk of harm—either emotional or physical—due to the parents' history of domestic violence. We agree with that assessment, given that none of the incidents were adjudicated, the parents have since divorced and are living apart, and the last incident occurred more than three years prior to the date of A.S.'s removal from the home. (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, 718 [court determined that domestic violence between parents occurring at least two and probably seven years before the filing of the section 300 petition was insufficient to support a current substantial risk of physical harm].) This leaves the April 17 incident, and father's "emotional instability and erratic behaviors" as the basis alleged for A.S.'s detention under section 300, subdivision (b).

The evidence shows that father has anger issues. These issues appear to be related to his diagnosed personality disorder with some mix of paranoid and narcissistic features, which render him dysfunctional when he perceives an injustice or attempts to right perceived wrongs. The record reflects not just the April 17 incident in the school library,

but also other circumstances demonstrating a pattern of confrontational behaviors or personality issues, including his history at Goodwill, the history of problems at A.S.'s previous school and the more recent history of incidents at A.S.'s current school leading up to the episode in the library.

The record, however, fails to demonstrate how father's anger issues caused any risk that A.S. would suffer serious physical harm or illness if she remained in father's care. (§ 300, subd. (b)(1).) "Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at pp. 814, 823.) Section 300, subdivision (b) does not provide for jurisdiction based on emotional harm, or, as the trial court found here, a substantial risk of "increased anxiety." Emotional harm in and of itself, absent serious physical harm or a risk of serious physical harm, is not a basis of jurisdiction under subdivision (b). (*In re Daisy H., supra,* 192 Cal.App.4th at pp. 717, 718.) Jurisdiction based on emotional harm is the subject of subdivision (c), which would be rendered superfluous if it were subsumed under subdivision (b).

There being no evidence that A.S. was at substantial risk of physical harm or illness, the trial court erred in sustaining the section 300 subdivision (b)(1) allegations.[14]

### C. Allegation c-1: At Risk of Serious Emotional Damage

There is no dispute that father has a personality disorder that includes a paranoid style of cognitive functioning, which causes father to become angry based on his perception that people may be against him or withholding assistance. Father also exhibits

---

[14] The Department argues on appeal that there was evidence that "Father's violence was turning toward" A.S. based on father's "rough handling" of A.S. on "two separate occasions, including his departure from the library on April 17, 2012." This refers to father grabbing A.S.'s hand and "yanking her hard" through the library door, and on another occasion—after the confrontation regarding the photographs—pulling A.S. down the hall so that she had to "walk very quickly to keep up." These incidents cannot possibly qualify as putting A.S. at risk of physical abuse, particularly given that the Department itself does not accuse father of physical abuse, A.S. denies any physical abuse, and there is no evidence of any such abuse in the record.

aggressive or angry behavior when he believes—correctly or not—that his daughter is being bullied or is the subject of ridicule. This behavior, and A.S.'s reaction to the April 17 incident, gave rise to concerns that father may be subjecting A.S. to abuse. The school psychologist, who herself was fearful of father based on earlier interactions, opined that A.S.'s reaction to father's behavior during the April 17 incident caused her concern that father is "subjecting [A.S.] to emotional abuse, in the form of creating undue anxiety" due to father's paranoia. The school principal expressed fear that father was going to hit him, and stated his concern for the physical and emotional safety of A.S. The social worker expressed the view that father "presents" as mentally ill. There was also concern about the history of domestic violence incidents. These facts form the core of the Department's evidence supporting the (c)(1) allegation and A.S.'s removal.

The jurisdiction and disposition reports added more background information, such as father's criminal history, which included convictions for petty theft in 1983, burglary in 1990, and brandishing a firearm replica in 2003, but no convictions since that date.[15] The reports also noted that father had been banned from Goodwill Industries due to personality issues, and relayed concerns expressed by teachers and school personnel that father's erratic and threatening behavior appeared to be escalating. And, at trial, father's psychiatrist testified that father suffers from anxiety, a personality disorder and a paranoid cognitive style.

In short, the Department carried its burden of proving that father has a mental condition that manifests in erratic and angry behaviors. The question is whether there is sufficient evidence that his condition and those behaviors are putting A.S. "at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior . . . ." (§ 300, subd. (c)(1).)

No one has claimed that father directly inflicts either physical or emotional abuse on the child. A.S. herself has expressed she is fearful of father "when he gets angry" and

_____

[15] Father was arrested for battery in December 2010; apparently he was not prosecuted.

22

was scared when he got angry at the school; she wishes he would not get angry so often, but she is not afraid of her father, and has consistently requested that she be returned to his home.

As father correctly points out, during the years, months and days preceding A.S.'s removal, the record reflects no urgent concerns with A.S.'s well-being. The Department received no prior referrals relating to A.S., and there are no allegations of abuse prior to the April 17 report. A.S. had no record of excessive tardies or absences from any of her schools. A.S. was unfailingly reported as being "sweet" and "polite" with no behavioral difficulties at school. Moreover, with respect to A.S.'s emotional condition in early 2012, in February the school psychologist sent father a letter stating that A.S. was not being bullied, and there were "no outward signs of anxiety." On April 12, the school psychologist reported to SMCH that A.S. had not been found eligible for services based on an emotional disturbance, and that she was "functioning well in school."

Two reports in early 2012—one evaluating A.S. for SMCH services, and one evaluating A.S. for an IEP—however, raised some red flags. One report diagnosed A.S. with an Anxiety Disorder in addition to Tourette's Syndrome and some compulsive behaviors. She was described as having suffered trauma from her history of witnessing domestic violence, and as being " 'at risk' " in the areas of social stress, sense of inadequacy, self-reliance and relation to parents. Although one report concluded that A.S. had no "severe needs" or any emotional disturbance that was interfering with her ability to attend to her school learning, the other report indicated that A.S.'s anxiety was "causing problems, consistent with [a] diagnosable disorder."

Dr. Speicher's report, which we have described in detail, also raised concerns about A.S. Father criticizes that report on a number of grounds. Father points out that the evaluation was not undertaken until after A.S.—who is consistently described as a polite child with no behavioral problems—was acting out in her foster home to such a degree as to require her eventual removal, and this intervening circumstance was notably

23

absent from Dr. Speicher's report.[16] Additionally, Dr. Speicher premised her assessment, in part, on the Department's report that father failed to follow up on A.S.'s medical appointments, leading Dr. Speicher to conclude he had "put [A.S.] at risk." Father contends this allowed Dr. Speicher to speculate that A.S. needed a caregiver that would provide better follow-through, despite the absence of any evidence that the missed appointments ever put A.S.at risk.

We agree with father that Dr. Speicher's report suffers from significant flaws in both its timing and its assumptions. These do not, however, destroy the evidentiary value of her report and testimony. Dr. Speicher testified that father's angry behavior and his failure to understand its impact on A.S. was "very, very concerning," and would contribute to "serious [emotional] harm" of A.S. This opinion was based on the incident in the school library as well as "[father's] behavior with other professionals," A.S.'s level of anxiety, and A.S.'s past exposure to domestic violence. While in her report she could not determine whether A.S.'s tic disorder was caused by stress and anxiety or whether A.S.'s anxiety is that which commonly accompanies Tourette's Syndrome, Dr. Speicher explained that regardless of whether the disorder is a result of a neurological condition, "or [the] effect of the domestic violence and/or ongoing anger or lack of ongoing anger, it needs to be dealt with, and there needs to be a demonstration that she's going to be safe and have attention paid to her experience of things that cause her anxiety." Dr. Speicher also testified that father's conduct was a potential cause for A.S.'s "regressive and dependent behaviors," but "you can't parcel that out just because of the difficulty with the diagnosis." She concluded that it all would have to be sorted out during A.S.'s treatment.

In order to support jurisdiction under subdivision (c) of section 300, the court must find that a parent's conduct caused serious emotional damage or the risk thereof, "as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior."

---

[16] Dr. Speicher testified that the delay in the referral may or may not have affected the evaluation.

(*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 ( *Alexander K.*).)  Subdivision (c) "thus sanctions intervention by the dependency system in two situations:  (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment.  [¶] In a situation involving parental 'fault,' [as is alleged in this case] the petitioner must prove three things:  (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*Ibid.*)  Father contends that, as in *Alexander K.*, there was insufficient evidence that his personality disorder or behavior caused or would put A.S. at risk of suffering severe emotional harm, as defined by the statute.  We disagree.

In *Alexander K.*, the parents had separated when the child was about one year old. (*Alexander K., supra,* 14 Cal.App.4th at pp. 551–552.)  At about four years of age, the child began resisting visitation with the father on several occasions and had vomited and complained of nausea following some visits. (*Id.* at p. 552.)  Also, on two occasions the mother noticed the child's penis was inflamed. (*Ibid.*)  An independent witness eating at a restaurant where the father and the child were also eating, reported that the child went under the table five times to look for puzzle pieces and put his hands on father's crotch each time.  The witness reported that father reacted only once. (*Id.* at p. 553.)

A psychologist conducted an evaluation of the child and observed a father-son visit.  She concluded he was " 'very frightened of one particular person,' " that he felt alone and facing "overwhelming forces." (*Alexander K., supra,* 14 Cal.App.4th at p. 554.)  The expert believed the child was both frightened and protective of his father, and the child told her that he was "kind of scared" of his father and did not want to see him. (*Ibid.*)  The child's testing indicated that he was "very depressed, anxious, afraid, and felt out of control in his world." (*Ibid.*)  In observing the child's visit with the father, the child was described as "guarded, anxious and regressed in his behavior." (*Ibid.*)

25

The expert opined there was evidence that father had a " 'probable psychiatric disorder' " with " 'very strong paranoia thinking,' " and recommended a psychiatric evaluation and psychotherapy. (*Alexander K., supra,* 14 Cal.App.4th at p. 555.) The child's therapist described the father as having "anger and intrusive behavior" that might be attributed to his belief that he was a victim of "the child abuse industry" or of mother. (*Id.* at p. 554.) The father also had a history of committing domestic violence on the mother when the child was less than a year old. (*Id.* at pp. 551–552.)

The father's expert testified that after administering a series of tests, he concluded that the father had some compulsive obsessive personality traits, focused on detail to a great degree, but functioned within normal parameters. He found nothing indicating that the child would be in any danger visiting with the father. (*Alexander K., supra,* 14 Cal.App.4th at p. 554.) The father volunteered to take a polygraph examination and the examiner found that he truthfully answered that he had never touched the child, nor the child him, for sexual reasons. (*Id.* at p. 555.) The parties stipulated that if the child were to testify he would say he couldn't remember why he did not want to visit his father, that he misses his father and wants to see him on a regular basis. (*Id.* at pp. 555–556.)

The trial court found that there was insufficient evidence to prove that the father had sexually molested the child, but found that, "as a result of father's conduct, the child has suffered emotional damage and is in danger of suffering additional [damage] as [a] result of his conduct," and made the jurisdictional finding under section 300, subdivision (c). (*Alexander K., supra,* 14 Cal.App.4th at p. 556.) The court found to be true all the facts alleged except the allegations of sexual molestation. (*Id.* at pp. 556–557.) At the dispositional hearing, the court ordered supervised visitation for the father, and a reunification plan that included weekly therapy. (*Id.* at p. 557.)

On appeal, this court reversed. Given the legal standard that "subdivision (c) seeks to protect against *abusive* behavior that results in severe emotional damage"— abuse being defined as " '[t]o ill-use or maltreat; to injure, wrong or hurt' "—we concluded: "[W]e are hard pressed to fathom how the trial court could render the ultimate finding that . . . [the child] was [one] as described in subdivision (c)," because

26

"none of these facts are substantial evidence of abusive maltreatment on [the father's] part toward his son." (*Alexander K., supra,* 14 Cal.App.4th at p. 559.) This court acknowledged the expert's opinion that the father had a "probable" mental disorder and the child was frightened of him, but concluded there was no evidence of abusive conduct posing a current danger to the child. (*Id.* at p. 560.)

Here, there was evidence that A.S. suffered from anxiety and that father had a personality disorder manifested by periodic outbursts of untoward anger, which increased A.S.'s anxiety. Witnesses observed A.S. become extremely anxious during the school library incident, and also when father was confronting the parent educator during the visitation. A.S. reported that father " 'gets angry a lot, at a lot of people' " and that she gets scared when he is angry, and does not know what to do. Although she denied any abuse, she did state that father gets angry at her about things like her spilling food, and that she would like to return to live with him but wishes he would not be angry so much. Father himself accepts Dr. Merrin's diagnoses, i.e., that father suffers from a personality disorder, cognitive distortions and dysfunctional personal interactions. Dr. Merrin described how father can become "confrontative . . . in a way that others find unpleasant" when he interprets others' words and actions as malicious or deceitful, or dismissive of father's concerns.

Dr. Speicher opined that A.S. was at risk of serious emotional harm based on the information provided by the department, including the history of domestic violence, the history of father's angry confrontations, and father's inability to understand the impact of his anger on A.S., which she found "very, very concerning." In sum, while there is no evidence of affirmative abusive maltreatment by father, there was enough evidence upon which the trial court could find that A.S. is at risk of serious emotional damage that may be attributable, at least in part, to father's personality disorder, paranoid cognitive style, and angry conduct, as evidenced by A.S.'s episodes of severe anxiety.

Father contends the record showed that, up until April 17 and even in the days thereafter, A.S. was reported to have been doing well in school and while she was diagnosed with an anxiety disorder, she had no severe needs, no behavioral issues, no

serious emotional disturbances and there were no signs of any abuse. Father also argues the evidence did not prove that A.S.'s anxiety is "severe" or that it was caused by father, as opposed to being anxiety associated with A.S.'s Tourette's Syndrome or a family history of the condition. These contentions are not without merit, but the question we must answer is whether, after the precipitating event on April 17, and after various persons recognized the possibility of A.S. being at risk of harm due to anxiety induced by father's outbursts, and in light of father's past history and his current diagnosis, the evidence as a whole supports the finding that A.S. was *at risk* of serious emotional damage. We conclude that it does.

In *In re Matthew S.* (1996) 41 Cal.App.4th 1311, the mother had delusions that her 13-year old son's penis had been mutilated and that she had murdered his doctor. (*Id.* at p. 1314.) Mother's son and daughter also described other delusions mother had. (*Ibid.*) The expert who examined the son found that he was " 'healthy, and reasonably well-adjusted,' " and was able to recognize his mother's delusions and to deal adequately with them. (*Id.* at p. 1317.) The expert also opined that the child " 'remains silent [and] does not speak up for an apology . . . out of a fear he will aggravate his mother's emotional problems," (*id.* at p. 1320) and that "at this time in his life, Matthew S. did not have the capacity 'to escape from [his mother's] generalized and overwhelming sense that everybody is in immediate danger from some obscure, threatening force.' " (*Id.* at p. 1321.)

The majority acknowledged that Matthew had a close and warm relationship with his mother, is a good student and is "reasonably well-adjusted." (*In re Matthew S., supra,* 41 Cal.App.4th at p. 1317.) It concluded, however, that while the child's reticence to speak about his feelings and his reluctance to seek assistance were "understandable" this also reflected "withdrawal," (*id.* at p. 1321) and therefore Matthew was at substantial risk of suffering "serious emotional damage" because he "neglected his own emotional needs because of his fear of aggravating his mother's condition." (*Ibid.*) Further, the court concluded, the "continuing jurisdiction of the court would help ensure that [the mother] continue to keep her fears to herself . . . [thus relieving] Matthew S. from the burden of

his mother's delusions." (*Ibid.*) The court determined, however, that the risk of harm did not require removal from the home. (*Ibid.*)

In the present case, there was also evidence that A.S.'s anxiety disorder was potentially caused, at least in part, by father's conduct, which put A.S. at risk of "serious harm." Although no expert specifically opined that A.S.'s anxiety was "severe" a reasonable inference can be drawn from Dr. Speicher's report and testimony, and from the testimony of other witnesses that A.S.'s anxiety was, at times, sufficiently severe to cause clinical concern. Dr. Vranken-Kemper and Dr. Hamman also opined that A.S. suffered from an anxiety disorder.

In sum, it has been proven that father has been diagnosed with a personality disorder with a paranoid cognitive style, manifested in periodic incidents of angry confrontations based on perceived injustices. It has been proven that father's conduct, when it occurs in front of A.S., causes her intense anxiety. Even considering father's substantial arguments that the evidence does not prove, vel non, he was the cause of A.S.'s anxiety disorder, there is enough evidence, under the preponderance of the evidence standard, to support a finding that father's personality disorder and paranoid cognitive style contribute to *the risk* of A. S. suffering serious emotional damage, and the jurisdictional order was therefore not in error.

### D. Dispositional Order

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.)

Section 361, subdivision (c)(1) provides for the removal of a dependent child only if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Subdivision (c)(3) permits the removal of a child if the court finds by clear and convincing evidence that "[t]he minor *is suffering*

29

severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior . . . and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ." (Emphasis supplied.)

Although jurisdictional findings are prima facie evidence the child cannot safely remain in the home (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146), section 361 pertaining to dispositional orders was intended to apply only to extreme cases of parental abuse or neglect. *In re James T.* (1987) 190 Cal.App.3d 58, explained the statute's purpose: "The language of section 361 is both clear and specific. In Welfare and Institutions Code section 300 proceedings a child is not to be removed from its parents unless there is clear and convincing evidence of one of the enumerated extreme cases. . . . Section 361 embodies legislative solicitude for parental rights." (*Id*. at p. 66.) On appeal from a dispositional order, the substantial evidence standard is applied, but "[w]hen applying the substantial evidence test . . . we bear in mind the heightened burden of proof. [Citation.] 'Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." [Citation.]' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

We are genuinely concerned about the long-term emotional health of A.S., who has been subjected to her parents' domestic violence and to her father's paranoid cognitive style and anger episodes. At the same time we are strictly enjoined to protect the parent-child relationship from unjustified or undue disruption by the State. "The right to privacy and to be let alone by the government in 'the private realm of family life' is among the basic values of ordered liberty. [Citation.] In deference to the parent-child relationship, the Legislature directed child protection 'shall focus on the preservation of the family whenever possible . . . [and is not] intended to disrupt the family unnecessarily or to intrude inappropriately into family life, to prohibit the use of reasonable methods of parental discipline, or to prescribe a particular method of parenting.' (§ 300, subd. (j).)." (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 199–200.)

30

In this case, there is evidence to support a conclusion that A.S.'s anxiety disorder *might* be attributable, at least in part, to father's behavior, but there is no clear and convincing evidence that this is so. According to Dr. Speicher, the issue is a complex one, given the diagnosis of Tourette's Syndrome; it is very difficult "to differentiate the anxiety component as either cause (primary diagnosis that contributes to tics and OCD) versus effect (result of neurological compromise)," and therefore, it is important for all of A.S.'s medical providers to work together to monitor her condition. What A.S. needs from her father, Dr. Speicher testified, is the ability to manage "a concerted team effort in terms of her treatment approach and consistent compliance with treatment," including therapy, and possibly medication for the tic or anxiety disorder, and not just be focused on whether A.S. is being bullied.

It thus remains to be determined whether A.S.'s anxiety relates primarily to her Tourette's Syndrome, perhaps combined with her past exposure to domestic violence, or is caused, in whole or in part, by father's behavior.[17] Because father's anger outbursts demonstrably result in transient incidences of intense anxiety for A.S., imposing a jurisdictional order for purposes of maintaining a watchful eye while A.S. receives the evaluation and treatment prescribed by Dr. Speicher to sort out the issues of cause and effect, is supported in both the evidence and the law. (*In re Matthew S., supra,* 41 Cal.App.4th at p. 1321 [exercising jurisdiction to ensure that parent does not give voice to her delusions].) But this record does not demonstrate that A.S. was already suffering "severe emotional damage" or that her emotional well-being would be in "substantial danger" if she were returned to father's care at the time of the hearing.

Here, there is no claim that father abused, neglected, or mistreated A.S., either physically or emotionally, and the Department had not received any prior reports on the family. While in father's care, A.S. attended school regularly and exhibited no behavioral problems. The assessments prepared just prior to and immediately after the

---

[17] Notably, there is also a family history of anxiety disorder, which may be part of A.S.'s overall picture.

April 17 incident indicated that A.S. had no severe needs nor clinically significant findings. Rather, A.S. was described by her teacher at that time as having a positive attitude, being very attentive, working hard and playing well with other children. In fact, during early April 2012 it was reported that A.S. had had a dramatic drop in the number of her tics. While A.S. indicated she was fearful of father when he became angry, she never expressed a generalized fear of her father and consistently requested she be returned home.

It also appears the Department itself had no urgent concerns with respect to A.S.'s emotional well-being or in providing treatment for A.S. upon her detention. The Department did not arrange for A.S. to begin therapy until late August—some four months after her detention and only after A.S. was engaging in out-of-control behavior in her foster home. There was no explanation for the delay. Nor did the social worker contact A.S.'s therapist at any time during the hearings in this matter; she therefore had no idea of the therapist's opinion as to A.S.'s emotional condition. A psychological evaluation of A.S. was not scheduled until after the jurisdictional hearing had commenced, and nearly five months after A.S. was detained. The Department also did not pursue any treatment for A.S.'s Tourette's Syndrome.[18] In short, the Department's inaction indicates it was their view that A.S. was not *in extremis*, or, indeed, in need of any treatment at the time of her removal.

Additionally, the evidence shows that father is able to ensure that A.S. receives the kind of comprehensive medical and psychological treatment that Dr. Speicher has suggested for A.S., and that he does not focus solely on whether A.S. is being bullied. During early 2012, father had pursued an evaluation of A.S. with her pediatrician at Kaiser, for possible Tourette's Syndrome or a seizure disorder. Father took A.S. for an EEG, which ruled out seizure disorder. Father then took A.S. back to the pediatrician

---

[18] Garcia did not recall receiving paperwork from father regarding a referral to the UCSF Tourette's Clinic, and did not follow up on it, although father testified he had discussed it with Garcia, and the record shows that father requested and received from UCSF duplicate forms in June.

because of concerns about A.S. drooling. He also sought a referral for a speech therapy evaluation. Father also sought and secured from A.S.'s pediatrician a request for an IEP, based on the presumptive diagnosis of Tourette's Syndrome. Father also requested an evaluation of A.S. for eligibility for services at SCMH, which services were pursued during March, except for the two missed appointments with the psychiatrist. After the presumptive diagnosis became a known diagnosis of Tourette's Disorder, Anxiety Disorder and ADHD, father began doing research and found the Tourette's Society, which referred him to the UCSF Tourette's Clinic, which provides a "team approach." In late February, he secured an appointment for A.S. in June. Father's efforts on A.S.'s behalf were interrupted only by the Department's removal of her from his home.

We do not ignore the brief testimony from Juana Garcia, that A.S. would be at risk of harm if she is returned to her father because he has not attended anger management classes, and from Dr. Speicher, who believed that A.S. should not be returned to her father until he understands how his anger affects his daughter, and until he can put her needs always above his own. Dr. Speicher, however, did not opine that A.S.'s emotional well-being would be in "substantial danger" if she lived with father, but only that father's behaviors put A.S. *at risk* of emotional harm—something we have already discussed with respect to the jurisdictional order. And Garcia provides no explanation as to *how* father's anger issues—which are the manifestations of his personality disorder—create any of the risks described in section 361. As explained in *In re Jamie M.* (1982) 134 Cal.App.3d 530, 541, father's mental disorder does not justify removal of his child unless the Department proves convincingly *how* the child will be harmed by the parent's mental illness, and the trial court must then balance the risk of that harm against the harm created by removing a child from her home.

"Often the harm created by removing a child from its parents may be more serious than the harm which the state intervention seeks to prevent, [citation] because the courts lack the ability to insure that the placement is superior to the child's own home. Moreover, children in foster care experience the anxiety of identity problems and conflicting loyalties caused by having three sets of adults with a stake in caring for them

33

(The foster parents, the natural parents, and the social workers.) [Citation.] The children may also be harmed by viewing the placement as a punishment for some unknown thing they have done wrong." (*In re Jamie M. supra,* 134 Cal.App.3d. at p. 541, footnote omitted.) "Although balancing these two potential harms may be difficult, 'the juvenile court is constantly faced with the necessity of choosing on behalf of a child, the best of several not entirely satisfactory alternatives." (*Ibid.*)

Accordingly, "[i]t cannot be presumed that a [parent] who is proven to [have a mental illness] will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less than socially acceptable and yet they are loving and compassionate parents. Conversely, there are parents who always exhibit socially acceptable behavior publicly, but whose children have parent-induced psychological and emotional problems their entire lives. The trial court's duty in this situation is to examine the facts in detail. The social worker must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness." (*In re Jamie M., supra,* 134 Cal.App.3d at pp. 541–542.) "The court must then weigh the evidence of the harm which will be caused the children if they remain in parental custody against the harm caused by placing the children in foster care. Only after this balancing has taken place, based on all the available evidence, can the court make an informed decision which can be said to be truly in the best interests of the children." (*Id.* at p. 542.)

While the circumstances present at the time of detention may have been sufficiently alarming to detain A.S. initially—particularly when she did not return to school following the April 17 incident and it was learned she had failed to attend the psychiatric appointments—after all the evidence was compiled, it was insufficient to support removal. There was no evidence that father had ever abused or neglected A.S. or that she was not well cared for in father's home. Although father's paranoid cognition resulting in angry outbursts and his dysfunctional exchanges with professionals have undoubtedly caused transient spikes in A.S.'s stress and anxiety, the evidence also indicated that father had taken good care of A.S.'s physical and mental health and sought

assiduously to provide her with services to address her Tourette's Syndrome and her educational needs. There is no evidence that A.S. was in acute distress necessitating immediate treatment when she was detained, nor did she appear to have any residual consequences due to the April 17 incident. A.S. not surprisingly said she was "a little bit scared" of her father when he got angry, but she had no generalized fear of him and consistently asked to be returned to his care.[19] (*In re Jamie M., supra,* 134 Cal.App.3d at 542 [court erred in removing child from mother diagnosed with schizophrenia, where evidence showed that mother had taken good care of the children, despite three hospitalizations and a report of bizarre delusions precipitating the detention].)

Further, at the time of the hearing, father had completed parenting classes, was receiving monthly psychiatric care, was seeing a licensed therapist, and stated his intention to begin domestic violence treatment to better understand how the domestic violence had affected his daughter. The testimony that A.S. had told the social worker father's anger frightened her also made an impression on father, and he intended to address that issue as well. Although father had made virtually no progress in acknowledging his anger episodes and understanding how they affected others, he had accepted his psychiatrist's diagnosis, and his need for treatment. Since the April 17 incident, apart from the two occasions when Garcia asked father to "modulate his tone" during telephone conversations, father had not exhibited any confrontational conduct.[20] In all, there was insufficient evidence to support a dispositional order that A.S. could not be safely be returned to father's home.

---

[19] While A.S. appeared to adjust well to her placement in VOTM, she suffered some sort of severe reaction to her placement in foster care, evidenced by a dramatic— and anomalous—deterioration in her behavior. This is the very type of harm the court should have carefully balanced against the potential harm, if any, of returning A.S. to her father. (*In re Jamie M.*, *supra,* 134 Cal.App.3d at pp. 541–542.)

[20] Garcia attributed the absence of outbursts to the presence of a guard in the visitation area, which is where she would regularly encounter father. But father has demonstrated his capacity to barge into an office or room and angrily make demands. The record reflects no such incidents since April 17.

We also agree with father that there is no evidence supporting the second requirement of section 361, subd. (c)(3), viz., that there be "no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of . . . her parent." Apart from the court's recital of the statutory language, we find nothing in the record evidencing any consideration of alternative means to protect A.S. while permitting her to remain with her father. Unquestionably, father was capable of procuring for A.S. the comprehensive medical, psychiatric, and therapeutic services Dr. Speicher recommended for her. As father suggests, with regard to the primary concern that A.S. suffers increases in anxiety when she sees father angrily confronting the various professionals he deals with, the Department could have considered imposing a condition that father conduct all such meetings without his daughter being present. Although there was no evidence of abuse or neglect in the home, unannounced visits by the Department could regularly assess A.S.'s condition in her home setting. In a similar vein, A.S. could have been court-ordered into therapy, where her anxiety and emotional well-being could be regularly monitored. (See, e.g., *In re Henry V.* (2004) 119 Cal.App.4th 522, 529–530 [removal improper where unannounced visits and public health nursing services could be used to supervise in-home placement while bonding study undertaken].) Additionally, A.S. was a ten-year-old child who attended school and had regular contact with teachers and other mandated reporters, who could assess her condition daily. (*In re Hailey T., supra,* 212 Cal.App.4th 139, 147 [error to remove four-year-old sibling of infant allegedly abused on one occasion, where sibling had not been abused, had good language skills, and attended school].)

In this difficult case, there was sufficient evidence to support a jurisdictional finding so that A.S.'s emotional and neurological health can be monitored while her conditions are comprehensively evaluated and a determination made regarding the role father's personality disorder and angry behaviors may be playing in A.S.'s emotional life. (See, e.g., *In re Matthew S. supra,* 41 Cal.App.4th at p. 1321.) But the courts cannot remove a child from her father's home because she is frightened by, and her anxiety and stress is increased by, father's episodic and irrational anger. "A dispositional order

36

removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency system' [citation], after which a series of findings by a preponderance of the evidence may result in termination of parental rights. Due process requires the findings underlying the initial removal order to be based on clear and convincing evidence." (*In re Henry V.*, *supra,* 119 Cal.App.4th at p. 530.)

## III. DISPOSTION

The jurisdictional order is affirmed. The dispositional order is reversed, and all subsequent orders are moot.[21] Father's appeal from the December 2013 orders, case number A140703, therefore, will also be dismissed as moot. The trial court is directed to conduct another dispositional hearing in accordance with the principles expressed herein. In light of A.S.'s placement with mother, our decision is without prejudice to any party on remand as to whether A.S. should be placed with father, mother, or both. The Department will bear costs on appeal.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

---

[21] On December 9 and 10, 2013, the court held a contested section 366.21 and 366.22 hearing. The court ordered return of A.S. to mother under a program of court-ordered family maintenance and terminated family reunification services to father.