14 Cal.App.4th 549 (1993)
18 Cal. Rptr.2d 22
In re ALEXANDER K., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY SOCIAL SERVICES DEPARTMENT, Plaintiff and Respondent,
v.
GERALD K., Defendant and Appellant.
Docket No. A057245.
Court of Appeals of California, First District, Division Four.
March 19, 1993.
*551 COUNSEL
Stephen Greenberg for Defendant and Appellant.
Victor J. Westman, County Counsel, and Mark Estis, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
ANDERSON, P.J.
By amended notice of appeal appellant Gerald K. seeks review of (1) an order sustaining jurisdictional findings concerning his son, Alexander (Sasha) K., born September 6, 1984; and (2) a dispositional order prohibiting visitation and contact between father and son except as agreed upon by their respective therapists.

I. BACKGROUND

A. Pre-Petition Events

During a six-month period in 1985, appellant assaulted his wife, Ana C., five times. He grabbed her neck and choked her. Sasha screamed and appellant would hold him, saying the mother was too upset. The couple *552 separated in October of that year when Sasha was 13 months old. Appellant was Sasha's primary caretaker the first year of his life.
Sasha lived with his mother after the separation; visitation was by informal arrangement, and there were some overnights. A more formal schedule was worked out with a mediator from family court services. Appellant lived in Kansas from about March 1987 to April 1988 and Sasha visited him there on several occasions.
From Ms. C.'s perspective, visitation "went pretty well" during this time frame and Sasha generally "was very excited to see his father...." After a visit he would be "quite excitable" and sometimes had stomach pain.
In May 1989 Ms. C. reported a change in Sasha's attitude toward visiting his father. On May 5 Sasha got out of the car as usual but when his mother started to leave, he grabbed her and said he did not want to stay. Appellant had to carry Sasha to the house, kicking and screaming. On May 12 Sasha again started saying he did not want to go to his father's. Upon arriving at appellant's house, Sasha locked the car doors and rolled up all the windows. During the next couple of days Sasha told his mother he did not want to "see his daddy ever again."
Sometime around one of the May 1989 visits Sasha complained that it hurt to urinate. Ms. C. noticed Sasha's penis was red and inflamed and there were spots of blood in his underwear. Two weeks later she took him to a doctor who described the symptoms as being consistent with an uncircumcised male. Also after one of the visits, Sasha vomited early in the morning and woke up crying.
After these incidents Ms. C. refused to take Sasha for his May 19 visit and, instead, filed a report with child protective services (CPS). She felt "Sasha had been mistreated, possibly sexually molested, by his father." At this time Sasha began having supervised visits and started seeing a therapist, Dr. Michael Baar. CPS did not initiate any proceedings.
Sasha did "pretty well" with these visits and seemed to "want to go" to see his father. Then, in February 1991, he again hid under Ms. C.'s coat, cried and said he did not want to stay with his father. Around this time Ms. C. also observed that Sasha's penis was inflamed, with a mucus discharge. Sasha's doctor prescribed a homeopathic remedy. Sasha often complained of nausea and stomach pain after visiting his dad. And, for the first time Sasha "French kissed" his mom, explaining his friends at school taught him.
The next month George Schumer, Sasha's stepfather, took Sasha for a visit with his dad. Schumer reported that Sasha crawled into the back of the truck and did not want to get out; appellant had to carry him out of the truck.
*553 Then on March 6, 1991, appellant and Sasha went to Nation's restaurant for dinner. John and Erin Hennessey were sitting at a nearby table and saw the two eating and working on a puzzle. When puzzle pieces fell on the floor, Sasha crawled under the table, picked them up and placed them back on the table. Mrs. Hennessey testified that on five occasions she saw Sasha put his hands on appellant's crotch and move his hands. Appellant reacted only once, when he said "Sasha," which Mrs. Hennessey thought was a pet name for penis.[1] She called her husband's attention to the situation; he reported seeing the last three incidents. The Hennesseys reported the matter to the police.
The Contra Costa County Department of Social Services (Department) filed a petition on March 15, 1991, alleging that Sasha's father had molested him on numerous occasions. The next month the Department filed an amended petition with six specific allegations.

B. Jurisdictional Hearing

The jurisdictional hearing was held over the course of seven months, during which time two counts were dismissed. We summarize the pertinent testimony.

(1) Mental Health Experts

A number of experts testified as to Sasha's and appellant's mental health. Dr. Baar, clinical psychologist, saw Sasha during the period June 1989 through March 1991. He concluded "there was a disturbance in Sasha's relationship to adult male figures." This disturbance manifested itself in Sasha's erratic relationship with the therapist. At the beginning of the therapeutic relationship, Dr. Baar found Sasha withdrawn, somewhat frightened and mildly depressed; these characteristics became less problematic with treatment. Dr. Baar also found him to be "quite angry." He felt Sasha had been the recipient of some level of trauma, but could not exactly identify the source. Possible sources were his parents' divorce; the history of violence between his parents; the absence of his father for approximately one year; and his mother's addictive relationship to marijuana until early 1989. Dr. Baar did not discover anything indicating Sasha had been sexually abused.
Sasha did not want to talk about his refusal to visit in May 1989. That summer he voiced some objections to seeing his father, but these were *554 typical objections against reasonable parental limits. Once visits resumed, Sasha's feedback generally was positive; at times he was "thrilled" about seeing his dad again.
Dr. Baar also had an opportunity to meet with appellant. In the summer of 1989 Dr. Baar was concerned about appellant's anger and intrusive behavior. However, once Dr. Baar set limits, appellant would "normalize." Dr. Baar felt "rebuffed" by appellant, but did not take it personally. Rather, he attributed this behavior to appellant's belief that he was an innocent victim being manipulated by the child abuse industry and perhaps by Ms. C.
Psychologist Rosemary Bower also met several times with Sasha, administered some tests, met with appellant and observed a father-son visit. Based on observing Sasha during play therapy, she concluded he was "very frightened of one particular person," he felt alone and that he was facing overwhelming forces. Dr. Bower thought Sasha was both frightened and protective of his father. Sasha expressed to her that he was "kind of scared" of his father and did not want to see him. The Rorschach test brought out that Sasha was very depressed, anxious, afraid, and felt out of control in his world.
Dr. Bower also commented on the "frantic episodes" of stuffing rocks into orifices of anatomically complete dolls. She did not "necessarily" interpret this to mean that Sasha had been sexually molested; however, the behavior did indicate he was anxious about sexual matters and had experienced sexuality. He also demonstrated that when he did not like little girls, he would grab his penis and point at them. Sasha said his dad told him to do that, then said God told him. Dr. Bower did not put much credence in appellant's role in this behavior, but again emphasized it pointed to a greater than normal level of anxiety and confusion about sexuality.
Regarding the visit with his father, Dr. Bower described Sasha as cautious, guarded, anxious and regressed in his behavior.[2]
Psychologist John Podboy testified on appellant's behalf. He met with appellant on six or seven occasions and administered various tests. Dr. Podboy concluded that appellant had some compulsive obsessive personality traits, focussed on detail to a great degree, but functioned within "normal parameters." He found nothing from his investigation and tests to indicate any danger to Sasha in visiting with his dad.
*555 Dr. Bower was recalled to rebut Dr. Podboy's testimony. She criticized his techniques and based on her own contact with appellant and her own analysis of the test results, concluded there was strong evidence of a "probable psychiatric disorder." What came through the testing was his "very strong paranoia thinking."
Dr. Bower recommended a psychiatric evaluation and psychotherapy. She felt unsupervised contact with the father was inadvisable because Sasha is "so frightened that he feels something could happen to him." She recommended regular, supervised contact "in a way that will deal with any issues that come up...."
In rebuttal to Dr. Bower's rebuttal, Dr. Podboy criticized her criticisms and again reiterated that his evaluation of appellant revealed no pathological problems.

(2) Other Witnesses for Appellant

Appellant himself testified as to his mutually caring and respectful relationship with his son. He stated Sasha never fondled him and he never encouraged any sexual contact with his son. Francis Connolly, an expert polygraph examiner, testified without objection that he posed the following control questions to appellant and received the following answers: (1) "`Have you ever touched your son, Sasha, for sexual reasons?'" Answer, "no." (2) "`Have you ever had your son, Sasha, touch you for sexual reasons?'" Answer, "no." (3) "`On March 6th, 1991, at Nation's restaurant, did you have your son go under the table in order to touch your genital area?'" Answer, "no." (4) "`... did you have Sasha go under the table only to retrieve puzzle parts?'" Answer, "yes." Examiner Connolly concluded there was "no doubt whatever" that appellant answered each question truthfully.
Appellant also presented a number of witnesses from a variety of walks of life who attested to his good character and the high quality of his relationship with his son. These included Anna Deloenx, an attorney and restaurant owner; Bryan Henrie, general contractor; Dennis Yniguez, consulting arborist and member of the Vedanta Society; Gail Gregory, corporate president and member of the Vedanta Society; neighbor Vera Smith; and teacher Katherine Baiber. They supported appellant's claim to a loving and appropriate relationship with his son, and noted that Sasha did not appear anxious, depressed, withdrawn or afraid or overpowered by his dad.
The parties stipulated that if Sasha were called to testify, he would say: nothing bad ever happened between him and his father, or at Nation's; once *556 he didn't want to visit his dad but can't remember why; he wants to see his dad on a regular basis, misses him, wants overnight visits and wanted to see him that day. The court permitted a 15-minute supervised visit on that day  September 30, 1991  the first visit since the 40-minute supervised visit with Dr. Bower, which was the first visit since inception of the dependency proceedings.

(3) Court Orders Regarding Visitation, Jurisdiction and Disposition

At the initial detention hearing the court ordered that the Department could deny visitation pending a determination of detriment to Sasha. Nine days later it limited appellant's contact to correspondence. The next month the court ordered no contact unless recommended and supervised by the Department, pending Dr. Bower's psychological report.
In her evaluation Dr. Bower recommended no unsupervised visits, that Sasha resume therapy with Dr. Baar, and that appellant receive a psychological evaluation, begin psychotherapy and receive "parent guidance" about how to "be" with Sasha before visitation resumes. Thereafter the court continued its prior orders regarding visitation and ordered Sasha's mother to take him to Dr. Baar. Dr. Baar believed Sasha should begin with a new therapist, and so informed the court. Dr. Bercovici was selected. In August 1991 she recommended visits be suspended for two months during which time appellant should "place himself in individual therapy with a senior therapist on at least a twice-a-week basis." (Italics in original.) Supervised visits could take place thereafter if his therapist deemed it appropriate. Dr. Bercovici arrived at this plan following a review of records, meetings with Sasha's mother and stepfather and therapy sessions with Sasha. She never met with appellant.
The next month the court permitted supervised visits, if approved by Dr. Bercovici, the Department and Sasha's attorney. None occurred.
At the conclusion of the jurisdictional hearing the court found as follows: "... I do not find that the evidence has been presented to me by a preponderance of the evidence that the father has sexually abused the child, but I do find that as a result of father's conduct, the child has suffered emotional damage and is in danger of suffering additional as result of his conduct finds the child comes within Section 300(c) of the Welfare and Institutions Code." As regards to the specific allegations in the petition, the court found that Sasha did go under the table at Nation's but did not find that he aggressively fondled his father's genitals; he did touch an area near his father's genitals or pants, but the father did react both in words and in extricating the minor from that position. The court further found that: (1) on *557 May 5, 1989, Sasha refused to visit and appellant had to forcibly remove him, screaming and kicking; (2) on May 12, 1989, Sasha refused to visit and locked the car doors to avoid the visit; (3) between May 15 and May 19, 1989, Sasha repeatedly stated he did not want to visit his dad ever again; (4) On February 27, 1991, Sasha hid under his mom's coat and clung to her neck in order to avoid visiting his dad; (5) on March 6, 1991, Sasha did not want to visit and had to be forcibly removed by his father to facilitate visitation; (6) Sasha frequently vomits and complains of nausea following visits with his dad; (7) between February 11 and March 14, 1991, Sasha attempted to "French kiss" his mother on several occasions; and (8) during their marriage, appellant choked and physically assaulted his wife on approximately five occasions in Sasha's presence.
At the dispositional hearing held April 3, 1992, the court ordered visitation to be arranged and supervised as agreed upon by therapists for Sasha and the father. It also ordered a reunification plan for appellant which included instructions that appellant enter weekly therapy with a senior therapist approved by the Department.
This appeal followed, attacking both the jurisdictional and dispositional orders.

II. DISCUSSION
(1) Sasha's dependency status is governed by Welfare and Institutions Code section 300, subdivision (c) (hereafter subdivision (c)), which states that a child who comes within the following description is within the jurisdiction of the juvenile court and may be adjudged a dependent thereof: "The minor is suffering serious emotional damage, or is at a substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care...." The statute thus sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment.
In a situation involving parental "fault," the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior.
*558 (2a) Appellant urges that subdivision (c) is so vague as to violate a parent's due process rights because it fails to give fair notice of what conduct to avoid. (3) The due process standard for testing legislative specificity is this: "`a statute which either forbids or requires the doing of any act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.'" (People v. Van Horn (1990) 218 Cal. App.3d 1378, 1401 [267 Cal. Rptr. 804], italics in original, quoting Connally v. General Const. Co. (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].)
(4) The right to custody of one's children, free from unwarranted state interference, is a fundamental right. (In re Robert P. (1976) 61 Cal. App.3d 310, 319-320, fn. 9 [132 Cal. Rptr. 5]; see also Santosky v. Kramer (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388].) In keeping with their constitutional due process rights, parents in dependency proceedings are entitled to be alerted as to the conduct prohibited by the dependency scheme. (In re J.T. (1974) 40 Cal. App.3d 633, 637 [115 Cal. Rptr. 553].) "However, all that is required is reasonable certainty and a statute will not be held void for uncertainty if any reasonable and practical construction can be given to its language." (Ibid.) If the statute can be made reasonably certain by reference to other definable sources, it will not be struck down. (Id., at p. 638.)
(2b) Appellant's legal concern with subdivision (c) is simply this: how can a court evaluate whether a child of a "broken" marriage suffers or is at risk of suffering serious emotional damage as a result of the conduct of a parent  as opposed to the inevitable tensions that result from the marital dissolution itself and ensuing visitation disputes  when the offending conduct is not specified? What level or type of behavior triggers the statute under these circumstances?
Subdivision (c) was included within section 300 as part of the Legislature's extensive revision of the dependency statutes in 1987. (Stats. 1987, ch. 1485, § 4, p. 5603, operative Jan. 1, 1989.) These revisions in turn were proposed by a task force which the Legislature established the preceding year. (Stats. 1986, ch. 1122, § 24, p. 3995.) In January 1988 the task force issued a report documenting the intent of the new laws. Regarding the new jurisdictional definitions, it had this to say: "The reason for revising Welfare and Institutions Code Section 300 is to provide more clear-cut guidance to social workers and judges regarding the types of situations which the Legislature considers abusive or neglectful. The task force determined that greater specificity was needed in order to ensure more uniform application of the law throughout the state and to ensure that court intervention does not *559 occur in situations the Legislature would deem inappropriate. [¶] The language of prior Section 300 is extremely broad and vague.... [The new legislation] provides ... definitions which focus on more specific harms to a child's physical well being, emotional development or physical safety." (Sen. Select Com. Rep. on Children & Youth/Sen. Bill No. 1195 Task Force (Jan. 1988) p. 3.)
As aptly stated in a recent appellate decision: "The legislative history thus confirms an unmistakable intention to narrow the grounds on which children may be subjected to juvenile court jurisdiction." (In re Rocco M. (1991) 1 Cal. App.4th 814, 823 [2 Cal. Rptr.2d 429].)
Consistent with this intention, subdivision (c) is quite specific regarding the type of impairment to the child's emotional functioning which will support intervention. However, it remains vague as to the parental conduct that would be at fault. We are assisted in our reading of this particular subdivision by the overarching intent expressed in the final paragraph of the statute: "It is the intent of the Legislature in enacting this section to provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm...." (Welf. & Inst. Code, § 300, subd. (j), italics added.)
It is clear from the overall scheme that the parental conduct branch of subdivision (c) seeks to protect against abusive behavior that results in severe emotional damage. We are not talking about run-of-the-mill flaws in our parenting styles  we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute. "Abuse" means "[t]o ill-use or maltreat; to injure, wrong, or hurt." (I Oxford English Dict. (2d ed. 1989) p. 59.) Viewed in light of the entire statute, subdivision (c) is not overly vague. Persons of common intelligence would not have to guess whether someone was maltreating their child to the point of causing severe emotional harm.
(5) Having said this, we are hard pressed to fathom how the trial court could render the ultimate finding that Sasha was a child as described in subdivision (c). We have no quarrel with the sufficiency of evidence to sustain the specific facts which the trial court found, but conclude that none of these facts are substantial evidence of abusive maltreatment on appellant's part toward his son. Simply put, none of the allegations which the court sustained support a finding under subdivision (c) because they focus on the child's behavior and reactions, not the father's behavior. There simply is no abusive conduct.
*560 There are four findings concerning specific episodes when Sasha showed resistance to visiting his father. The concern below was why did Sasha resist. The why was never established. The allegations concerning sexual abuse, which would have been sufficient to sustain a finding of emotional abuse as well, were rejected by the court. That Sasha hid behind his mother on one occasion and locked the car doors on another in order to avoid visits does not establish abusive conduct on appellant's part. Nor do the two incidents when appellant physically picked up Sasha in order to facilitate the visit. True, on one such occasion (May 1989) Sasha was kicking and screaming, but no one suggested that appellant was rough with or hurt the child. As to the second incident (Mar. 1991), Mr. Schumer explained that appellant "picked up" Sasha, who exhibited resignation but no physical resistance. Visits resumed without incident during the interlude between the spring of 1989 and 1991. As a matter of law these incidents cannot support a finding of emotional abuse perpetrated by appellant.
Similarly, Sasha's statements that he did not want to see his dad again, and the fact that he vomited and complained of nausea following visits say nothing of appellant's emotionally abusive conduct.
So, too, there is no connection between Sasha's attempts to "French kiss" his mother and appellant's behavior.
Further, we note that appellant's assaults on Sasha's mother while in the child's presence occurred in 1985, four years before the first instance of resistance to visitation and six years before the Department instituted dependency proceedings. Since then, the couple has divorced and there is no reason for concern about a recurrence of spousal abuse in Sasha's presence. There was no evidence about threats or violence since the couple separated. "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm...." (In re Rocco M., supra, 1 Cal. App.4th at p. 824, italics in original)
Finally, the Department emphasizes Dr. Baar's testimony about Sasha's disturbance in relationship to adult males, and Dr. Bower's testimony that appellant had a "probable" disorder and Sasha was frightened of him. Again, where is the evidence of abusive conduct, posing a current danger to Sasha?
This matter is disturbing to us because it seems as if the Department is attempting to build its case around an unstated presumption that in the absence of proof of abusive parental acts, certain emotional disturbances in a child, under certain circumstances, will nevertheless be attributed to the *561 fault of the parent. We do not think the Legislature intended to heighten the use and weight of inferences arising in dependency cases so as to pack the normal rules of circumstantial evidence against the parent.
The Department did not bear its burden of proving the subdivision (c) allegations. Accordingly, we reverse the jurisdictional order. The dispositional orders and all subsequent orders are moot. The Department's requests for judicial notice and augmentation concerning the dispositional issues are denied as also moot.
The Department will bear costs on appeal.
Perley, J., and Reardon, J., concurred.
NOTES
[1] As a child Mrs. Hennessey was sexually molested on several occasions by her father and a friend of her father's. Memories of these events came to light within the last three to four years and she has been in intensive therapy around these issues since that time.
[2] Dr. Baar testified that Dr. Bower had shared test results and her perceptions with him regarding appellant and Sasha. This new information raised "additional concerns" on his part because Dr. Bower was reporting a greater level of stress and disturbance in appellant and more significant depression in Sasha.