Filed 3/8/16  In re Giancarlo E. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re GIANCARLO E. et al., Persons Coming Under the Juvenile Court Law. | B262553 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JACQUELINE S.,<br><br>    Defendant and Appellant;<br><br>GIANCARLO E. et al.,<br><br>    Respondents. | (Los Angeles County<br><br>Super. Ct. No. CK97770) |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Draper, Judge.  Affirmed.

Kenneth P. Sherman for Defendant and Appellant Jacqueline S.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

Patti L. Dikes, under appointment by the Court of Appeal, for Respondents Giancarlo E. et al.

_____

**INTRODUCTION**

Jacqueline S. appeals from the juvenile court's jurisdiction finding and disposition order removing her two minor children, Giancarlo and Natalia, from her custody. Jacqueline argues that the evidence is insufficient to support the court's jurisdiction finding, under Welfare and Institutions Code section 300, subdivision (c),[1] that the children suffered or were at substantial risk of suffering serious emotional damage. She also argues that evidence is insufficient to support the removal order. We affirm the jurisdiction finding and the removal order.[2]

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *The Prior Dependency Proceeding*

On February 4, 2013 the Los Angeles County Department of Children and Family Services received a referral reporting that Jacqueline S. had checked herself into a hospital because of psychotic thoughts and that her husband, Juan R., who had observed her behaving strangely and talking to herself, was concerned Jacqueline might hurt their two-year-old son, Giancarlo, and their infant daughter, Natalia. On February 7, 2013 the Department received another referral stating that Jacqueline had experienced a mental breakdown and was accusing Juan of sexually molesting Giancarlo. The second referral

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     The children filed a cross-appeal, seeking review of the juvenile court's dismissal of allegations against Jacqueline under section 300, subdivision (b), in the event this court concluded that there was insufficient evidence to support the court's jurisdiction finding under section 300, subdivision (c). This was not necessary. (See Code Civ. Proc., § 906 ["respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to . . . review . . . matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal . . ."].)

occurred after Jacqueline called 9-1-1 to report that she saw Juan molesting Giancarlo in the family's living room. The Department investigated the referrals, detained the children, and filed a petition under section 300.[3]

On March 27, 2013 the juvenile court declared the children dependents of the court. The court sustained allegations pursuant to section 300, subdivision (b), that Jacqueline had a history of mental health issues that interfered with her ability to provide regular care and supervision of the children when she experienced delusional episodes, that Juan knew of Jacqueline's mental health issues and was unable to protect the children in a timely manner, and that these conditions put the children at risk of harm. The court placed the children with Juan under the Department's supervision.

In February 2014 the Department recommended that the juvenile court terminate jurisdiction and grant sole physical custody of the children to Juan and joint legal custody to Juan and Jacqueline, with monitored visits for Jacqueline. After a contested hearing, the court terminated jurisdiction on April 8, 2014 and ordered that Juan and Jacqueline have joint legal and physical custody.

B.    *The Current Petition*

On June 20, 2014 the Department received a referral reporting that Juan was sexually abusing Giancarlo and Natalia was at risk. The referral indicated that staff at a local hospital had called Los Angeles Police Department officers when Jacqueline brought Giancarlo to the emergency room for a sexual abuse examination after he had reportedly disclosed sexual abuse by his father. At the hospital Giancarlo stated that his father put his finger in Giancarlo's anus, kissed Giancarlo's penis, and had Giancarlo touch and kiss his father's penis. One of the officers stated that Giancarlo also pointed to his anus while saying, "Daddy hurts me," and that Giancarlo told the officer his father

---

[3]    The petition for the prior dependency proceeding is not in the record. Other documents in the record indicate that the Department filed a petition pursuant to section 300, subdivisions (b) and (j), and that the petition did not include an allegation of sexual abuse against Juan.

3

urinated on Giancarlo and Natalia's faces. A doctor at the hospital examined Giancarlo and Natalia and reported that they had "a normal exam, with no evidence of trauma or tearing."

Investigating the referral, the Department spoke with Jacqueline, who was in the process of obtaining a divorce from Juan and no longer lived with him. Jacqueline stated that she took Giancarlo to the hospital because the child had disclosed to her that his father was sexually abusing him. She denied coaching Giancarlo to make the statements he made at the hospital concerning sexual abuse. She also denied having mental health issues. She stated that Juan claimed she had mental health issues so that the court would remove their children from her, but that Juan had a pattern of lying. She also expressed concerns about Natalia because, according to Jacqueline, Giancarlo stated he had observed his father kissing Natalia's vaginal area and stroking his penis on her genital area. Jacqueline also stated that Giancarlo said his father threatened to cut off Giancarlo's penis if he discussed the abuse. Jacqueline called Juan "an astute pedophile," and she remarked that he "manipulate[d] his way to abuse the children."

The Department also spoke with Juan, who said this was not the first time Jacqueline had accused him of sexually abusing the children and that she did this because she wanted "to win." He attributed her most recent accusations to service on her of court papers requesting approval for the sale of their home and the return to him of $25,000. He said that Jacqueline "constantly threaten[ed] him with immigration and deportation" and that he lived in constant fear she would hurt the children in order to hurt him. He believed she was capable of physically hurting, or even killing, the children. He stated that Natalia had recently begun to display fear while taking a bath when she returned from visiting her mother and that both children "live in fear." Juan said he believed Jacqueline used the children to get what she wants, and that she told him the authorities will believe her because she was "a woman and a social worker." He said that Jacqueline had mental health issues and could not handle both children at the same time, and he believed Jacqueline coached the children on what to say. The Department determined

4

that Giancarlo and Natalia were not safe with either Jacqueline or Juan and removed them for placement in protective custody.

The Department interviewed four-year-old Giancarlo. Giancarlo said his father did not touch him or Natalia and asked, "Who said that?" Giancarlo then said that his father peed on Natalia's face but that his father was only playing around, and Giancarlo, pointing to his penis, said that his father touched his private area. Natalia, who was two years old, did not make any meaningful statement. A nurse practitioner examined the children and reported both of them had a "normal exam."

On June 25, 2014 the Department filed a petition alleging that Giancarlo and Natalia came within the jurisdiction of the juvenile court under section 300, subdivisions (b), (d), and (j). The petition alleged, pursuant to section 300, subdivisions (b), (d), and (j), that Juan put Giancarlo and Natalia at risk of physical harm, damage, danger, and sexual abuse by digitally penetrating Giancarlo's anus, causing Giancarlo to touch and kiss Juan's penis, and urinating on the child's face. The petition also alleged, pursuant to section 300, subdivision (b), that Jacqueline had a history of mental and emotional problems that interfered with her ability to provide regular care and supervision for the children and that her mental and emotional problems put the children at risk of physical harm, damage, and danger.

The Department filed a detention report noting the family's previous dependency proceeding and setting forth the facts regarding the Department's receipt and investigation of the June 20, 2014 referral. At the detention hearing, the court found that prima facie evidence showed Giancarlo and Natalia were persons described by section 300, subdivisions (b), (d), and (j), and that continuing to live in their parents' home was contrary to the children's welfare. The court detained the children, and ordered monitored visits with the children at least twice a week for Jacqueline and Juan.

C.    *The Amended Petition*

On July 9, 2014 the Department filed a first amended petition that added new allegations under section 300, subdivisions (b) and (c). The amended petition alleged

5

that Giancarlo and Natalia were victims of an ongoing custody dispute between Jacqueline and Juan, which included Jacqueline's continuing accusations that Juan was abusing the children, and that the custody dispute put the children at substantial risk of suffering serious emotional damage.

D.    *The Jurisdiction/Disposition Report*

On August 4, 2014 the Department filed a jurisdiction/disposition report that included a statement from multidisciplinary assessment team (MAT) assessor Cynthia Rodriguez, who had interviewed Giancarlo on July 23. Rodriguez reported that during the interview Giancarlo turned a teddy bear upside down and, touching the genital area, remarked, "Daddy touches me here." Giancarlo also told Rodriguez that his father touched him with his "sword" on the butt. Rodriguez stated that she felt conflicted about these statements because Giancarlo had a speech problem and she often did not understand what he was saying. She also stated that it was hard to assess whether Giancarlo had been sexually abused because "everyone keeps asking [him] questions" and it was difficult to tell whether he was confused, coached, or fantasizing.

The report included statements Juan had made to a Department social worker. Juan denied ever molesting his children, and he described a previous incident in February 2013 when Jacqueline falsely accused him of sexually abusing them. On that occasion, according to Juan, Jacqueline called 9-1-1 and reported to the emergency operator that she had walked into their home and saw Juan sexually abusing the children. She also told the 9-1-1 operator that Juan was armed with a gun. The police arrived and pointed their guns at Juan's head, at which point Jacqueline laughed and told Juan he could not win with her. Juan stated that he and Jacqueline "separated in February 2013 as a result of [Jacqueline] falsely accusing [him] of sexually abusing the children."

Juan also told the social worker that Jacqueline was using the Department to get back at him because he refused to return to their relationship. He said that he thought Jacqueline was very dangerous and that she saw the children as a means of obtaining money. Juan stated, "[Jacqueline] uses the system to hurt me and to hurt the children.

6

My son is suffering emotionally." He also stated that he had seen Jacqueline "sick" and hearing voices that told her what to do, and he feared something would happen to his children because Jacqueline was "crazy." He said she had been "emotionally abusive" toward Giancarlo and, because she was a therapist, she knew how to work the system and how to manipulate the children to get them to say what she wanted them to say.

The Department had not yet interviewed Jacqueline, but its report included an email from Jacqueline dated July 25, 2013. The email addressed a group of people to whom Jacqueline had previously written that Juan had molested Giancarlo. In this email Jacqueline stated that, "in a delusional state," she had "wrongly imagined" that Juan had sexually abused Giancarlo. She continued: "In a state of delusion, I reported the incident to the authorities, and my children were taken away. After my delusional state had been resolved, I continued to believe the erroneous conclusions I had come to about my husband. . . . Therefore, I continued to fight for my children's protection within the court system." She admitted that her "erroneous perceptions" caused people to start rumors and that, as a result, both her husband and her son had been ostracized by others in the community including by people at a local park who treated Giancarlo "as if he was infected, too." She stated that, "[a]lthough the Department of Children and Family Services believed [Juan] was innocent, many people in the community still judge him as an evildoer. I regret that I am the one who caused all this negative judgment on my husband, and I am devastated that I have caused this great suffering upon him and upon my family."

The report also included a statement from the children's caretaker, N.S. N.S. reported that Giancarlo had not made any spontaneous remarks to her regarding sexual abuse. She stated that she had known Jacqueline since the 1990s, Jacqueline needed help for mental health issues, and Jacqueline knew she was "not stable." N.S. stated that Jacqueline "takes every single thing the children say out of context, and in Jacqueline's mind "everything is perverted, everything is gross."

The Department recommended that the court dismiss the allegations in the amended petition that Juan had sexually abused Giancarlo (i.e., the first count under subdivision (b) and the counts under subdivisions (d) and (j)). The Department recommended that the court sustain the remaining allegations against Jacqueline. The Department further recommended that the court give Juan sole physical custody of the children and give Juan and Jacqueline joint legal custody with monitored visits for Jacqueline.

E.    *The Jurisdiction Hearings*

On August 13, 2014 the court, pursuant to the Department's recommendation, dismissed the allegations against Juan without prejudice. The court released Giancarlo and Natalia to Juan and ordered continued monitored visits for Jacqueline. The court continued the matter for a contested jurisdiction hearing as to Jacqueline.

From January 21, 2015 to February 5, 2015 the court held a contested jurisdiction hearing on the allegations against Jacqueline. The court received into evidence the detention report, the jurisdiction/disposition report, and other documents. The court also heard testimony from several witnesses.

1.    *Last Minute Information of January 21, 2015*

The court received into evidence a last minute information, filed by the Department on January 21, 2015, that included copies of several emails Jacqueline had recently sent to Department employees. In a long email sent to Department social worker Adrian Gonzalez on January 17, Jacqueline commented on a number of matters relating to her current and previous dependency cases. Among other things, Jacqueline stated that on February 7, 2013 she called the police to report that Juan was sexually abusing the children because she found other women's business cards in his truck and thought he was cheating on her. She stated, "I am guilty however. I called the police when [Juan's] actions were against me personally. . . . I called the police on [Juan] not because I was angry at him having sexually abused the kids, but because he had cheated on me."

Nevertheless, she continued to insist that Juan was a "pedophile" who sexually abused the children. She also stated that she lied in her July 25, 2013 email by "pretending" to have been confused and delusional when she purportedly saw Juan sexually abusing Giancarlo, "when in reality [she] absolutely saw the fondling." She then described a number of instances between April and July 2014 in which Giancarlo allegedly disclosed to her that Juan was sexually abusing him or demonstrated behavior that indicated sexual abuse. For example, she stated that during a monitored visit on July 11, 2014 Giancarlo repeatedly tried to put his tongue in Jacqueline's "private area," that she "frantically told him to stop several times," and that Department social worker Rocio Sanchez witnessed this interaction. The last minute information included a statement from Sanchez indicating that this incident did not occur and that she would never have allowed something like that to take place.

The last minute information also included an email Jacqueline sent to Juan on January 17, 2015, accusing Juan graphically and at length of sexually abusing Giancarlo and Natalia. Saying she was speaking on behalf of God, she concluded, "I will make sure that they discover you! . . . [¶] You feel like you're such a man, very strong, and very macho. Let's see who is stronger. You want to make a bet? [¶] You will lose, you will lose. . . . [¶][¶] I will see you in court Juan Carlos. The Lord will win."

2.     *Testimony of Jacqueline S.*

Jacqueline testified that beginning February 1, 2013 she began to "grapple" with a "delusion" that Juan would soon die, which culminated with her checking herself into the hospital on February 4, 2013. She recalled that at some time between February 1 and February 4 she called a life insurance broker and asked him to prepare a policy for Juan to sign. The broker brought the policy to the home, but Juan refused to sign it, which upset Jacqueline. Jacqueline told Juan that, if he did not sign the policy, she would call the Department and report that she had seen him sexually abusing their children. On February 4, however, just when she was about to call the Department to report Juan's sexual abuse, Jacqueline suddenly concluded she was wrong, that Juan had "good

9

intentions towards the kids," and that she "must be losing it," so she asked Juan to take her to the hospital. She was in the hospital overnight, and released on February 5. On February 7 she came home to find the children upset and hungry, and, after an exchange of words with Juan, she told him she had seen him allow Giancarlo to fondle his penis. She testified that she then called the police about what she had seen, and several officers arrived at their home and took the children to the hospital. Jacqueline denied coaching Giancarlo to make allegations against Juan. She stated that, after the prior dependency case ended in April 2014, she took the children to her therapist to "assess their safety" in light of her belief that Juan sexually abused them. She stated that she did not tell the therapist she believed Juan had molested Giancarlo, only that Giancarlo had "night terrors," because she did not want to affect her therapist's assessment. She stated that Giancarlo did not mention anything to the therapist about having been molested.

   3.  *Testimony of Juan R.*

  Juan testified about the events that occurred in early February 2013. He stated that when he refused to sign the life insurance policy as Jacqueline requested, she became angry and yelled at him, saying that if he did not sign she would call law enforcement officers and tell them he had sexually abused Giancarlo and Natalia. Jacqueline was angry and continued to yell for hours, in the presence of the children. Several days later, at approximately 9:00 p.m., Juan, Jacqueline, Giancarlo, and Natalia were at home when Sheriff Department deputies knocked on the door. Juan had no idea they were coming, and when he opened the door Jacqueline yelled, "It's him!" and the deputies pushed him down and yelled, "Where is the gun?" Juan told the deputies he did not have a gun. Juan testified that while the deputies had him on the floor, Jacqueline came to his side, grabbed Giancarlo and Natalia, and yelled at Juan, "You never should have gotten into it with me! You are going to see the power that I have!" The deputies then pulled Juan outside, where they called him an abuser or child molester, and put him in a police car. Juan stated that witnessing this incident affected Giancarlo, who was now afraid of

10

sheriff deputies and police officers, and called them "bad" because they took his father away.

### 4. *Testimony of Elizabeth Castillo*

Elizabeth Castillo, the dependency investigator assigned to the case, testified that there had never been any physical evidence that Juan had abused the children and that she had no concerns about placing them in Juan's care. She stated that the Department had observed Giancarlo with Juan since the children had been placed in his care and Giancarlo had given no indication he was afraid of Juan or had been sexually abused. Castillo believed Jacqueline coached Giancarlo to make allegations of sexual abuse against Juan because, during the relatively long period in which the children were in Juan's care, including during the pendency of the prior dependency case when a Department social worker was involved, no one ever expressed any concerns about abuse. But once the prior dependency case ended and Jacqueline had unmonitored contact with the children, the allegations of abuse began and, in Castillo's words, "two months later here we are again." Castillo considered Jacqueline "hypervigilan[t]" because of her "ongoing disclosures that the father has sexually abused the kids and then recanting that and then stating that again."

### 5. *Testimony of Cynthia Rodriguez*

Rodriguez, who was a licensed mental health specialist and had interviewed Giancarlo on two occasions, testified that she saw no evidence Giancarlo had been sexually abused. She did observe, however, signs of emotional distress, such as Giancarlo's tendency to become agitated and avoid conversation when she and Giancarlo's caretaker discussed his family or his separation from his parents. In written case notes admitted into evidence, Rodriguez observed: "[Giancarlo] is anxious, agitated, often angry, states mother doesn't love him and that he is angry at father"; "[Giancarlo] is anxious, aggressive, angry"; "Giancarlo seemed to have feelings of anger towards his parents due to the constant conflicts between them"; and "[Giancarlo] presents with

11

anxious mood, irritable, agitated, gets upset when parents call, cries easily for small things, as reported by [the caregiver]." Rodriguez diagnosed Giancarlo with anxiety disorder.

### 6. *The Court's Findings*

The court dismissed the allegations against Jacqueline under section 300, subdivision (b). The court stated that there was no evidence of physical injury or non-speculative risk of physical injury to the children and that the allegations of emotional distress did not support jurisdiction under subdivision (b).

The court sustained the allegations under section 300, subdivision (c). The court found that Juan did not sexually or physically abuse Giancarlo or Natalia, that Jacqueline nevertheless made and continued to make false allegations that Juan was abusing the children, and that these "continuing false accusations" were causing the children emotional distress. As evidence of the children's emotional distress, the court cited Rodriguez's report that Giancarlo was anxious, moody, irritable, and agitated, that he got upset when his parents called, and that he cried easily over minor things. The court also found that Jacqueline's continued allegations of sexual abuse put the children "at a substantial risk" of severe and permanent emotional damage. The court noted that years two through four were the most important in a child's life for forming attachments with adults, and that a child who did not form healthy attachments during that period likely never would. Referring to Jacqueline's continuing false allegations that Juan had sexually abused Giancarlo and Natalia, the court observed, "I don't see how it could possibly be that these kids could form attachments with that kind of situation."

### F. *Disposition and Appeal*

On February 5, 2015, after the court stated its jurisdiction finding but before it proceeded to disposition, Jacqueline addressed the court, stating that the Department lied and that Juan was "a child molester and a pedophile." She then stated: "God knows and all this court is accountable, your honor. So you want to put me on monitored visits? I

will continue to fight for my kids. You push me down. Even if you kill me, I will continue to fight for them."

The court declared Giancarlo and Natalia dependents of the court pursuant to section 300. The court found by clear and convincing evidence, pursuant to section 361, subdivision (c), that there was a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if they were returned to the home, and that there were no reasonable means to protect the children's physical or emotional health without removing them from Jacqueline's custody. The court removed Giancarlo and Natalia from Jacqueline and placed them with Juan. The court then immediately terminated jurisdiction, pending receipt of a family law order giving sole physical custody of the children to Juan and joint legal custody to Juan and Jacqueline, with monitored visits for Jacqueline.

Jacqueline timely appealed.

## DISCUSSION

A.    *Substantial Evidence Supports the Juvenile Court's Jurisdiction Finding*

In reviewing the juvenile court's jurisdiction findings, "'we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.) If there is substantial evidence to support the juvenile court's jurisdiction finding, we must uphold the finding even if other evidence would support a contrary conclusion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

Section 300, subdivision (c), gives the juvenile court jurisdiction over any child who "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward

13

aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." To establish jurisdiction under this provision, "the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 (*Alexander K.*); accord, *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921.)

In contending that there is not sufficient evidence to support the juvenile court's jurisdiction finding that Giancarlo and Natalia were persons described by section 300, subdivision (c), Jacqueline makes two arguments. First, with respect to the "offending parental conduct" requirement, she cites *Alexander K.* for the proposition that section 300, subdivision (c), does not protect children against "run-of-the-mill flaws in our parenting styles," but protects only against "*abusive* behavior" that can cause severe emotional damage. (*Alexander K.*, *supra*, 14 Cal.App.4th at p. 559.) Jacqueline asserts that there was no substantial evidence she engaged in "*abusive* behavior" that would cause severe emotional damage. In particular, she contends there was no evidence she coached Giancarlo to make accusations of sexual abuse against Juan.

The "offending parental conduct" identified by the juvenile court, however, was not Jacqueline's coaching of Giancarlo, but Jacqueline's "continuing, false accusations" that Juan was abusing the children. That determination rested on the court's finding that Juan did not sexually or physically abuse the children, a finding Jacqueline does not contest. There was abundant evidence that Jacqueline persisted in falsely accusing Juan of abusing the children. Jacqueline testified that in February 2013 she reported to law enforcement that Juan had sexually abused Giancarlo. The Department's detention report noted that, when the Department interviewed Jacqueline in June 2014, she called Juan "an astute pedophile" and said that he "manipulate[d] his way to abuse the children." Jacqueline's January 17, 2015 email to Gonzalez referred to Juan as a "pedophile" and stated he had and continued to sexually abuse the children. Jacqueline's January 17, 2015 email to Juan accused him of sexually abusing Giancarlo and Natalia and indicated

that Jacqueline would persist in making such allegations: "I will make sure they discover you!"

There was also substantial evidence that Jacqueline made these allegations against Juan, not because she thought they were true and was concerned about her children's safety, but because she was angry with Juan for personal reasons. For example, in her January 17, 2015 email to Gonzalez, Jacqueline stated that she called the police to report Juan's alleged abuse in February 2013 because she found business cards of other women in his truck and believed he was having an affair. Jacqueline testified that, several days before she made that call to police, she threatened to call the Department and report that Juan had sexually abused their children because he would not sign a life insurance policy. Hardly a run-of-the-mill flaw in parenting style, this behavior satisfies the "offending parental conduct" requirement. (*Alexander K.*, *supra*, 14 Cal.App.4th at p. 559; see *In re A.J.* (2011) 197 Cal.App.4th 1095, 1104 [offending parental conduct under section 300, subdivision (c), included mother's false reports to police against father]; *In re Christopher C.* (2010) 182 Cal.App.4th 73, 81, 84 [offending parental conduct under section 300, subdivision (c), included false allegations of sexual abuse between parents embroiled in family law conflict]; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1314, 1320-1321 [offending parental conduct under section 300, subdivision (c), included mother's acting on delusions that son's penis was mutilated].)

Second, Jacqueline argues there was no evidence the children suffered or were at risk of suffering serious emotional harm within the meaning of section 300, subdivision (c). There was substantial evidence, however, that Giancarlo had suffered, and was at substantial risk of further suffering, serious emotional harm. Rodriguez testified that, in her interviews with him, Giancarlo demonstrated signs of emotional distress, such as becoming agitated or avoiding conversation when she or his caretaker discussed his family or his removal from his parents. Rodriguez also observed that Giancarlo was anxious, irritable, agitated, aggressive, and often angry, that he experienced anger because of the conflicts between his parents, that he stated that his mother did not love him, and that his caregiver reported that he became upset when his parents called and

cried easily over small things. She even diagnosed Giancarlo with an anxiety disorder. This evidence supports the court's finding that Giancarlo suffered and was at substantial risk of suffering emotional distress sufficient to support jurisdiction under section 300, subdivision (c). (See *In re Roxanne B.*, *supra*, 234 Cal.App.4th at p. 921 [section 300, subdivision (c), requires proof of "'serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior'"].)

Substantial evidence also supports a reasonable inference that Giancarlo's emotional distress was caused by Jacqueline's false accusations of sexual abuse against Juan. As a result of Jacqueline's false report to police in February 2013, Giancarlo witnessed sheriff deputies push his father to the floor of the family home and arrest him at gun point, was subjected to a hospital examination for evidence of abuse, and then experienced separation from his father when the Department initiated the prior dependency proceeding. According to Juan, Jacqueline's false accusations of abuse caused the couple's separation and divorce. According to Rodriguez, Giancarlo exhibited "anger towards his parents due to the constant conflicts between them." And according to Jacqueline's July 25, 2013 email, her accusations against Juan started rumors in the community and caused people to treat Giancarlo at a local park "as if he was infected, too." This evidence strongly suggests that Jacqueline's false accusations against Juan created a volatile, emotionally harmful environment for Giancarlo. (See *In re Christopher*, *supra*, 182 Cal.App.4th at pp. 84-85 [noting damaging emotional effect on children exposed to family law conflict between parents involving allegations of sexual abuse].)

Finally, while there was little evidence that two-year-old Natalia exhibited the signs of serious emotional harm described by section 300, subdivision (c), jurisdiction under that subdivision is also appropriate when the child is "at a substantial risk" of suffering such harm, even when there is insufficient evidence of actual harm. (§ 300, subd. (c); see *In re D.P.* (2015) 237 Cal.App.4th 911, 919 [section 300, subdivision (c), "applies to a child who is at substantial risk of suffering serious emotional damage even

when there is insufficient evidence of actual harm"]; *In re Matthew S., supra,* 41 Cal.App.4th at p. 1320 [section 300, subdivision (c), applied where, "[a]lthough the children [had] not as yet suffered harm at their mother's hands, substantial evidence point[ed] to potential serious emotional harm"].) Jacqueline gave no indication that she intended to stop falsely accusing Juan of sexually abusing Giancarlo and Natalia. It was therefore reasonable for the juvenile court to conclude that Natalia was at a substantial risk of suffering the same emotional harm from those accusations that Giancarlo suffered.

> B. *Substantial Evidence Supports the Juvenile Court's Disposition Order Removing the Children from Jacqueline S.*

Section 361, subdivision (c)(1), provides that a juvenile court may remove a dependent child from the physical custody of his or her parent if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." "'Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" *(In re J.S.* (2014) 228 Cal.App.4th 1483, 1492.)

Jacqueline contends that there is insufficient evidence to support the juvenile court's disposition order removing Giancarlo and Natalia from her custody pursuant to section 361, subdivision (c). As with the juvenile court's jurisdiction findings, we review the findings supporting a disposition order under the substantial evidence standard. *(In re D.C.* (2015) 243 Cal.App.4th 41, 55.) Thus, "'[w]e review the record to determine

17

whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.)

Jacqueline argues there was insufficient evidence that the children were at risk of serious harm if returned to her care because, as she argued in connection with the court's jurisdiction finding, there was no evidence she engaged in "abusive behavior" toward the children. As discussed, however, there was substantial evidence that Jacqueline's continuing false accusations of sexual abuse against Juan caused serious emotional harm, and the risk of serious emotional harm, to Giancarlo and Natalia. After the court made its jurisdiction finding, Jacqueline indicated to the court that she would continue to press those accusations. There is substantial evidence to support the court's finding that returning the children to Jacqueline's care would continue to expose them to her offending conduct and present a substantial danger to their emotional well-being.[4]

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed. The children's cross-appeal is dismissed.


SEGAL, J.

We concur:


PERLUSS, P. J.                                    BLUMENFELD, J.[*]

---

[4]     Jacqueline does not contend there was any reasonable means of protecting the children other than removal.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18