Filed 3/25/22  In re Noah R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re NOAH R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRITTANY R.,<br><br>        Defendant and Appellant. | E077871<br><br>(Super.Ct.Nos. J289323 & J289324)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Dismissed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

Brittany R. (mother) appeals from the juvenile court's order taking jurisdiction over her 15-year-old daughter Taylor M. under Welfare and Institutions Code[1] section 300, subdivisions (c) and (g), based upon several allegations: that the child was suffering serious emotional damage; that mother was unable to provide for Taylor's special needs without assistance and failed to ensure that she regularly received appropriate mental health treatment; and that she refused to provide or arrange ongoing mental health treatment, care, and supervision following Taylor's discharge from a hospital after a psychiatric hold.

The juvenile court, however, also sustained an allegation that mother does not challenge on appeal: that pursuant to section 300, subdivision (b)(1), mother had a mental health disorder and aggressive outbursts that impaired her ability to parent Taylor during the child's mental health crisis and placed her at risk of serious physical harm or illness. Further the court sustained unchallenged allegations against Zachary M. (father) pursuant to section 300, subdivision (b)(1) (failure to protect) and subdivision (d) (sexual abuse). Because we can grant mother no effective relief, we dismiss her appeal.

---

[1] Undesignated references are to the Welfare and Institutions Code.

II.

BACKGROUND

A. *Facts about Mother and Daughter*

San Bernardino County Children and Family Services (CFS) received referrals in April and May 2021, alleging physical and emotional abuse of Noah R. (age seven), and physical, emotional, and sexual abuse of Taylor.[2]  The allegations included that mother refused to pick Taylor up from a hospital after Taylor's release from a psychiatric hold. According to the referral, mother feared for her own safety and did not think Taylor was getting the help she needed.

Taylor told an investigating social worker that there were times she forgot to take her prescribed psychotropic medication, or she would take two doses on the same day. She reported a history of cutting herself and said she used a digital application to keep a running record of the dates she harmed herself.  She admitted she vaped and viewed adult websites.

Taylor reported that her mother became aggressive when angry, and sometimes she would hold Taylor down and scream in her face.  She acknowledged that she and mother physically fought and that she had sustained bruises to her buttocks, legs, and elbows.  Taylor stated that mother was verbally abusive; they argued and fought "a lot"; and she had to "run away to get away."  She admitted that she had attempted suicide after

_____

[2]  While mother's notice of appeal included both Noah and Taylor, she makes no appellate claims about Noah.  A section 300 petition was filed for Noah as well as Taylor, but Noah has remained placed with mother.

3

she and mother argued and fought, and she felt this was the only way out. She stated she was sexually abused by father and was sexually abused by a friend's stepfather when she was eight or nine years old. She said she had depression and anxiety but believed she had bipolar disorder, like her mother. Taylor claimed she was open to family therapy with mother, but said when mother had agreed to it, it never happened.

Mother denied ever physically assaulting or disciplining Taylor. She explained that she would restrain and make physical contact with Taylor when Taylor attempted to commit suicide or try to leave the home. She acknowledged forcibly throwing Taylor to the floor or onto her bed and restraining her by holding her down by her arms. She said she did this to prevent her daughter from harming herself. She did not deny screaming and cursing at Taylor while restraining her. Mother admitted she put a hole in Taylor's bedroom door but claimed that occurred only because she made a fist to stop the door from hitting her when Taylor slammed it. She said she tried to stop Taylor from leaving the home due to her risky behaviors. Mother acknowledged that she suffered from bipolar disorder and took medication.

Mother reported that she enrolled Taylor in mental health services in November 2020, and as a result, Taylor received therapy and was prescribed Lexapro. However, because Taylor moved around from one family member to the next, it made it difficult for her to consistently engage in services and take her medication. Mother also reported that her daughter had displayed self-harming behaviors since the sixth grade.

Mother also denied refusing to pick Taylor up from the hospital. She said she had run out of options, although she had sought mental health treatment for the child. Mother

claimed that the hospital did not want to treat Taylor because her symptoms and illness were not severe, and she begged them to offer her something, such as residential mental health treatment.

Around the time of the referrals to CFS, Taylor had stayed with a maternal aunt for about two weeks due to the domestic disputes between Taylor and mother. The aunt stated that she was aware of arguing and yelling between mother and Taylor, but had not witnessed physical fights. She indicated that mother made several trips to her home to try to resolve her issues with Taylor.

B. *Jurisdiction and Disposition*

After a section 300 petition was filed, Taylor was placed in protective custody. At the detention hearing, the court ordered Taylor detained in a short-term residential therapeutic program, with visitation for mother for two hours a week. The court further authorized CFS to provide services in order to reunify Taylor with her family pending the development of the case plan.

During the period of the dependency where mother participated in predisposition services, a social worker reported mild improvement in mother's ability to address Taylor's mental health issues, but the social worker believed that mother needed to continue to receive services to appropriately provide for Taylor's mental health needs. Mother provided Taylor with a cell phone without advising the social worker or group home staff, despite that she was requested not to do so.

CFS attempted to place Taylor back into mother's care with support services in place, with Taylor expressing a desire to return to mother and to continue mental health

treatment while in mother's custody. Mother began services, including parenting classes and individual therapy. She also obtained a family therapist and completed a session with Taylor. Additionally, mother took steps to obtain community resources.

Taylor began overnight weekend visits with mother. Taylor also was diagnosed with bipolar disorder, posttraumatic stress disorder, anxiety, and "Chronic, Cannabis use disorder, moderate." She was prescribed psychotropic medication because she was having difficulty sleeping, "racing thoughts, pressured speech, increased energy, intermittent depression, anxiety and experience[d] auditory hallucinations." These issues were "[i]mpaired by psychosis and mood instability."

Taylor did well in mother's care and CFS confirmed that in-home services were in place. The plan included help with "family functioning, impulsivity, anger control, trauma issues, attachment disruption and improving family relations." Both mother and Taylor appeared to be making progress in services. Mother reported that Taylor was doing well on her new medication and that the change in medication had made a "world of difference." She was proud of how Taylor was handling school. Mother said she did not currently have any bipolar symptoms and took her medication regularly.

CFS's amended petition for Taylor contained allegations under section 300, subdivisions (a), (b), (c), (d), and (g). As to subdivision (b), the allegation not challenged on appeal, CFS requested that the juvenile court sustain an allegation that mother suffered from mental health issues that impaired her ability to appropriately parent Taylor during the child's mental health crisis and that based upon mother's mental health diagnosis,

6

mother experienced aggressive outbursts of anger which placed Taylor at risk of neglect, harm and/or abuse.

CFS also requested that the court sustain the allegations (challenged on appeal) under section 300, subdivision (c), that mother was unable to provide for Taylor's special needs due to Taylor's serious emotional problems, as well as that mother failed to ensure that Taylor received mental health treatment for a mental illness resulting in self-harming behaviors. Finally, CFS requested that the court sustain an allegation under section 300, subdivision (g), that mother refused to provide Taylor with mental health treatment upon her discharge from the hospital.

At the jurisdictional/dispositional hearing, similar to the approach on appeal, mother's counsel did not argue against the section 300, subdivision (b) allegation, but argued that the subdivision (c) and (g) allegations should be dismissed. The court found that Taylor came within section 300, subdivisions (b), (c), (d), and (g), and dismissed the subdivision (a) allegation. The court declared Taylor to be a dependent and ordered family maintenance services for mother.

III.

DISCUSSION

On appeal, mother contends that substantial evidence did not support the juvenile court's findings under section 300, subdivisions (c) and (g). The subdivision (c) findings

7

determined her to be incapable of providing Taylor with adequate mental health care.[3]

The subdivision (g) finding was that she refused to provide or arrange for ongoing mental health treatment, care, and supervision for Taylor following the child's discharge from a hospital after a psychiatric hold.

Mother does not challenge the court's jurisdiction under section 300, subdivision (b), which was grounded in her own mental health disorder, nor does she challenge the court's findings pertaining to father. As a result, the juvenile court's jurisdictional order will not be reversed regardless of the outcome of this appeal. (*In re M.M.* (2015) 236 Cal.App.4th 955, 964 ["the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition"]; *In re Briana V.* (2015) 236 Cal.App.4th 297, 308 [" '[A] jurisdictional finding good against one parent is good against both' "].) CFS contends the appeal is moot for this reason. We agree.

Under the justiciability doctrine, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490-1491.) "An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*Id.* at p. 1490.) "For this reason, an appellate court may decline to address the evidentiary support for any

---

[3] Although the juvenile court sustained two separate allegations pursuant to section 300, subdivision (c), mother does not address the two allegations individually but instead makes a single argument why substantial evidence did not support the court's findings.

remaining jurisdictional findings once a single finding has been found to be supported by the evidence," or is unchallenged. (*Id.* at p. 1492.)

On the other hand, an exception to this general rule has been recognized: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*).) Courts, for example, have frequently exercised this discretion in cases where the parent's appeal, if successful, would eliminate all jurisdictional findings against that parent, potentially affecting the court's placement and custody decisions. (See, e.g., *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1316-1317; *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613; *Drake M.*, at pp. 762-763.)

Mother claims that the accusation that she caused her daughter serious emotional damage under section 300, subdivision (c), and is unable to provide for her welfare under subdivision (g), has the "potential to harm her in future dependency and other proceedings." However, mother does not identify *how* the findings will prejudice her in future dependency proceedings or "other" proceedings, and we fail to identify any potential prejudicial effect on our own. (See *In re I.A.*, *supra*, 201 Cal.App.4th at pp. 1493-1495 [dismissal of a dependency appeal is appropriate when the appealing parent fails to suggest "a single specific legal or practical consequence" resulting from

9

the challenged jurisdictional finding].)  Moreover, we do not see how the juvenile court's finding under section 300, subdivisions (c) and (g), could prejudice mother in future dependency proceedings and other proceedings in a way that the court's subdivision (b) finding—which mother does not challenge—would not.

Mother also claims that the jurisdictional findings served as a "basis for the disposition orders and case plan" and the erroneous findings "lead to services and recommendations that are not tailored to the family's needs."  Therefore, she argues "inaccurate allegations have consequences for mother beyond the appeal and do not help the family by incorrectly framing the needs and issues to resolve the dependency."  We disagree.

First, it is not enough that the jurisdictional findings serve as a basis for dispositional orders and the case plan that was ordered.  Rather, as *Drake M.* instructs, an appellate court can exercise its discretion to reach the merits of a challenge to a jurisdictional finding when the finding "serves as the basis for dispositional orders that are *also challenged on appeal*."  (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762-763, italics added.)  Here, mother has not separately challenged the dispositional orders on appeal.

Next, since the juvenile court sustained the section 300, subdivision (b) allegation on the basis that mother had a mental illness and had aggressive outbursts that impaired her ability to parent Taylor during the child's mental health crisis and placed her at risk of serious physical harm or illness within the meaning of section 300, subdivision (b)(1),

there is no reason to conclude that mother would have received any different services if the subdivision (c) and (g) allegations were vacated.

Finally, to the extent mother is complaining the case plan is not tailored to the unique needs of her case, her claim is forfeited for not challenging it in the juvenile court. In fact, at the jurisdictional/dispositional hearing, mother's trial counsel actually *agreed* to the order for family maintenance services and submitted on the Department's recommendation. "An appellate court generally will not consider a challenge to a trial court's ruling if the aggrieved party could have, but did not, timely object in the trial court when its purported error could easily have been corrected. [Citations.]" (*In re M.S.* (2019) 41 Cal.App.5th 568, 588.)

Mother further argues that "the stigma of mental health is already so prevalent and invasive in this society, that blaming Taylor's mental illness on mother by sustaining jurisdiction under section 300, subdivision (c), with a finding there was 'emotional abuse' harms rather than heals this family. This finding continues an unproductive and harmful fallacy that the cause of mental illness can be blamed on others rather than treating it as an illness." We disagree.

Whatever societal stigmas exist, the sad reality is that there unfortunately are cases where parents cause the child's emotional damage, and those can create jurisdiction under the statute. As mother acknowledged in her opening brief, section 300, subdivision (c) " sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e. when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no

11

parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment." (*In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921; see *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)  Where the petition alleges the emotional damage is a result of a parent's conduct, the Department must prove three things:  (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior.  (*In re Alexander K.*, *supra*, 14 Cal.App.4th at p. 557.)  Causation can be found where a parent did not cause the underlying mental health issue, but the parent's conduct caused the child's emotional problems to "worsen and persist" and thus was a "substantial factor in causing [the child's] continuing serious emotional damage." (*In re Roxanne B.*, *supra*, 234 Cal.App.4th at p. 923.)  Regardless of the applicability here, this court does not give an advisory opinion or issue an opinion on abstract or theoretical questions or propositions.  (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1490.)

In her reply brief, mother states, "[w]hat has not been proven in this case [i]s that mother's bipolar disorder was the reason or cause for Taylor's mental health issues, where mother's family has a history of mental illness.  As such, the allegation places an inaccurate focus on mother's mental health being the issue.  This result is prejudicial to mother and has consequences beyond jurisdiction."  CFS, however, did not allege in the section 300, subdivision (c) or (g) allegations that it was mother's bipolar disorder that caused Taylor's mental health issues.  Also, CFS did not have to prove mother's mental illness caused Taylor's mental health issues.  (§ 300, subd. (c).)  Therefore, there was not an inaccurate focus on mother's mental health in those allegations.

12

For the first time in her reply brief, mother contends her appeal is justiciable because "substantiated allegations create a record in a county-wide child abuse database that mother's mental health was the basis for an open dependency that mother would be unable to challenge if her appeal is dismissed as nonjusticiable." She claims substantiated allegations "may preclude mother from types of employment, kinship foster care or adoption based on a state determination of child abuse due to mother's mental health. . . . It can preclude a parent from volunteering at a school or extracurricular activities, even just from fear that information in the database will be disclosed." Notwithstanding the fact that mother's claim is forfeited for raising this claim for the first time in her reply brief, we disagree. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 ["Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief"] internal quotes omitted.)

"In California, state and local agencies maintain information on child abuse allegations primarily in two statewide databases—the Child Welfare Services Case Management System ('CWS/CMS') and the Child Abuse Central Index ('CACI'). CWS/CMS is an internal government database used primarily by county child welfare agencies to enter and manage information related to reports of suspected child abuse. In contrast, CACI is a statewide index of substantiated child abuse reports maintained by the California Department of Justice ('CA DOJ') and 'available to a broad range of third parties for a variety of purposes.' [Citation]." (*Endy v. County of Los Angeles* (9th Cir. 2020) 975 F.3d 757, 760 (*Endy*).)

13

Mother did not identify whether she was referring to the CACI or CWS/CMS system. However, because the CACI is more publicly accessible than the CWS/CMS system, which the Ninth Circuit observed is an "internal database generally accessible only to government agencies" (*Endy*, *supra*, 975 F.3d at p. 765), we assume mother is contending that the juvenile court's jurisdictional findings under section 300, subdivisions (c) and (g), could result in her name being included in the CACI and that our reversal of those findings would give her the opportunity to challenge her inclusion on the CACI (Pen. Code, § 11170, subd. (a)) pursuant to the Child Abuse and Neglect Reporting Act (CANRA) (Pen. Code, § 11164 et seq.).[4]

The true findings under section 300, subdivisions (c) and (g), do not automatically trigger inclusion in the CACI. Instead, reporting is based on substantiated findings of child abuse or neglect. (Pen. Code, § 11165.6.) If a report of abuse is substantiated by a reporting agency, the agency forwards a report to the Department of Justice for inclusion in the CACI and notifies the suspected abuser he or she has been reported to the CACI. (*In re C.F.* (2011) 198 Cal.App.4th 454, 462-463; see Pen. Code, § 11170, subd. (a).)

The reported abuser can then challenge his or her inclusion by requesting a grievance hearing before the agency that made the referral. (Pen. Code, § 11169,

---

[4] The California Supreme Court granted review in an unpublished decision to consider whether an appeal of a jurisdictional finding is moot where the parent claimed stigmatization and an inability to challenge current or future placement on the CACI. (*In re S.P.* (Feb. 10, 2021, B301135) [nonpub. opn.] 2021 Cal.App. Unpub. Lexis 860, review granted May 26, 2021, S267429].) That case, unlike this case, involves a single jurisdictional finding under section 300, subdivision (b)(1), and both parents appealed. (*In re D.P.*, *supra*, at pp. *5-7 [2021 Cal.App. Unpub. Lexis 860 at pp. *5-7].)

subd. (d).) However, the agency "shall" deny the request "when a court of competent jurisdiction has determined that suspected child abuse or neglect has occurred." (Pen. Code, § 11169, subd. (e).)

Mother does not offer any evidence that she has already been placed on the CACI. Nor does mother contend she will be disqualified from working in any current or future position by her inclusion in the CACI or that she intends to become a foster or adoptive parent. Her argument about the potential adverse consequence of the juvenile court's jurisdictional findings is speculative. Even if mother has been reported to the CACI, we cannot say she would be removed if we reversed the section 300, subdivision (c) and (g) findings but not the unchallenged subdivision (b) finding that her mental illness impaired her ability to parent Taylor during the child's mental health crisis and that her aggressive outbursts of anger placed the child at risk of serious physical harm or illness. An individual may be listed in the CACI based on subjecting a child to a "substantial risk" the child "will suffer serious physical harm or illness," i.e., the basis for a finding under section 300, subdivision (b)(1). (See Pen. Code, § 11165.3 [reportable severe neglect, as defined in Pen. Code, § 11165.2, can be based on " 'the willful harming or injuring of a child or the endangering of the person or health of a child,' " which "means a situation in which any person willfully causes or permits any child to suffer, or inflicts thereon, unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of the child to be placed in a situation in which his or her person or health is endangered"]; Pen. Code, § 11165.6 [reportable – " 'child abuse or neglect' includes . . . the endangering of the person or health of a child,

15

as defined in Section 11165.3, and unlawful corporal punishment or injury as defined in Section 11165.4"]; see also Pen. Code, § 11165.2 [" 'neglect' . . . includes both acts and omissions on the part of the responsible person"].)

Finally, for the first time in her reply brief, mother asserts that "[e]ven an inconclusive report of child abuse listed in a county child abuse database satisfies the 'stigma-plus' test, as the information therein is disseminated to multiple agencies and amounts to a serious invasion of privacy without an adequate opportunity for the subject to rebut that evidence. (*Castillo v. County of Los Angeles* (C.D. Cal. 2013) 959 F.Supp.2d 1255, 1262.)" We reject this argument.

To the extent mother is claiming that sustained findings under section 300, subdivisions (c) and (g), can subject her to the risk of appearing in California's CWS/CMS database, her claims fail for the same reasons as stated previously. We do not see how she will be prejudiced when she has not challenged the section 300, subdivision (b) findings and we therefore have no reason to doubt that she would remain in the CWS/CMS system. In *Castillo*, the outcome of the case meant the difference between totally clearing Castillo's name. (See also *In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762-763 [the outcome of the appeal meant the difference for Father being a nonoffending parent].) The same information will be in the database about mother's mental illness and the facts of the case regardless of whether or not the section 300, subdivision (c) and (g) allegations are dismissed.

Additionally, in *Endy*, *supra*, 975 F.3d 757, the Ninth Circuit declined to extend *Castillo*. The court held, as a matter of first impression, that the father did not suffer

16

stigma as a result of being included in the CWS/CMS database as "unfounded" for two reasons: (1) he was not labeled as a child abuser because his allegations were deemed "unfounded" and not substantiated; and (2) the allegations are maintained in CWS/CMS, "an internal database generally accessible only to government agencies." (*Id.* at p. 765.) Here, although the allegations in mother's case were substantiated, the CWS/CMS system is an internal database that is only accessible to government agencies and she has failed to demonstrate how she will be harmed, specifically, if this court fails to address the section 300, subdivision (c) and (g) allegations. We cannot grant her any effective relief.

## DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


RAPHAEL
                                                                    J.


We concur:


RAMIREZ
                P. J.


MENETREZ
                J.


17